[S. F. No. 9997. In Bank.—March 18, 1922.]

## WATER USERS AND TAXPAYERS ASSOCIATION OF MERCED, Petitioner, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

[1] CONTRACTS — PURCHASE OF HYDRO-ELECTRIC ENERGY — RAILROAD COMMISSION—POWER TO APPROVE CONTRACT AND FIX RATES.—The Railroad Commission has power to approve a contract entered into by a light and power corporation with an irrigation district, and to fix the rate for hydro-electric energy to be purchased under the contract by the former from the latter, which contract provides that as soon as the irrigation district has constructed, completed, and put into operation its hydro-electric energy plant it will deliver and sell to the light and power corporation the entire electric output thereof, with certain exceptions, and that the light and power corporation shall pay therefor at the rate fixed by any contract which may exist between the parties for the purchase and sale of said hydro-electric energy so purchased by the irrigation district, to be approved by the Railroad Commission, or, in the absence of such contract, at a rate to be fixed by the Railroad Commission, the parties having agreed in another contract that the light and power corporation should transfer to the irrigation district certain rights in waters of a river, in consideration of the latter's agreement that in case of diminution of the hydro-electric energy output of the former by reason of the use of such waters by the latter, the former should be compensated as provided in the first mentioned contract.

[2] PUBLIC UTILITIES—JURISDICTION OF RAILROAD COMMISSION—TRANSFER OF WATER RIGHTS.—A privately owned public service corporation is within the jurisdiction and control of the Railroad Commission under the Public Utilities Act, and the transfer by it of valuable rights and privileges of which it is the owner in the waters of a river and which are being utilized in the course of its production of hydro-electric energy at its plant upon said river for sale to its customers is a matter for supervision and approval by the Railroad Commission under the terms of said act, as is its

attempt to acquire by purchase a certain *quantum* of hydro-electric energy to be thereafter distributed by it to its consumers.

[3] ID.—JURISDICTION OF RAILROAD COMMISSION—REGULATION OF CORPORATIONS.—The provisions of the constitution authorizing the legislature to confer upon the Railroad Commission powers to supervise and regulate public utilities apply exclusively to private corporations and natural persons or associations of persons, and do not include municipal corporations, even when engaged in the exercise of proprietary functions, and these principles have equal application to irrigation districts.

[4] ID.—PUBLIC UTILITIES ACT—FIXING OF RATES.—There is nothing in the Public Utilities Act (Stats. 1915, p. 115) placing such limitation upon the powers of the Railroad Commission in dealing with such matters as to deprive it of power, in determining the basis for the price to be paid under such contract by the light and power corporation for the hydro-electric energy to be purchased by it from the irrigation district, to take into account properties and plant of the latter which were not in existence at the time of such determination when the cost of their construction and their output of hydro-electric energy could not be known.

[5] ID.—PARTIES.—Water users and taxpayers of the irrigation district executing such contract have no such interest in proceedings for the approval of such contract and fixing of rates as would entitle them to bring in question the action of the Railroad Commission therein.

APPLICATION for Certiorari to review an order of the Railroad Commission approving a certain contract for the sale of electric energy. Writ denied.

John S. Partridge and K. C. Partridge for Petitioner.

Hugh Gordon and William W. Clary for Respondent.

A. L. Cowell for Merced Irrigation District.

THE COURT.—This proceeding was instituted by the Water Users and Taxpayers Association of Merced for the purpose of having reviewed and annulled certain proceedings before the Railroad Commission of California leading up to and resulting in an order of said commission approving a certain contract for the sale of electric energy proposed to be entered into between the San Joaquin Light and Power Corporation and the Merced Irrigation District. The questions to be disposed of arise upon the demurrers

of the Railroad Commission and the Merced Irrigation District. The averments of the petition which are thus taken to be true may be summarized as follows: On June 28, 1921, the Merced Irrigation District and the San Joaquin Light and Power Corporation joined in an application to the Railroad Commission, wherein it was stated in substance that the said irrigation district was proposing to construct a water reservoir and system for the conservation and distribution of water, and to establish and operate a hydro-electric generating plant in connection therewith at a certain point on the Merced River, and that the said irrigation district desired to acquire certain superior rights and privileges owned by the light and power corporation in and to the use of the waters of the Merced River, and that said irrigation district also desired to sell and the said light and power corporation to purchase energy generated by the said irrigation district's hydro-electric energy plant, and that for these purposes said parties were proposing to enter into two certain agreements which were attached to and made a part of said application, and the approval of which was sought thereby.

The first of these agreements recited that the light and power corporation owned certain interests in the lands along the banks of the Merced River upon which it had constructed a certain hydro-electric generating plant to be used in connection with a certain dam and reservoir impounding the waters of said river, and from which it was entitled to have said waters conducted to the said plant. That the irrigation district proposed and desired to construct certain storage and diversion works upon said river above the said plant of the light and power corporation, whereby, during certain seasons of the year, it would impound and withhold a certain portion or possibly all of the waters at such times flowing in said river in order that it might thereafter for its own use and advantage release said waters for the purpose of irrigating large areas of land in the county of Merced, whereby the said light and power corporation might be deprived of the use, benefit, and advantage of such waters, which would, to the extent thereof, interfere with and lessen the hydro-electric energy output which it could otherwise produce by the use of said waters with its present installations. In order to reduce such disturbance of the light

and power corporation's rights and privileges to a minimum and to compensate it therefor, it was proposed to be agreed that in case of the diminution of the hydro-electric energy output of the light and power corporation in any calendar year by reason of the said storage and diversion of water by the said irrigation district below a certain quantum measured in kilowatt hours, the irrigation district should compensate the light and power corporation therefor by paying to the latter a sum of money determined according to the terms of and at the rate fixed by any contract which might exist between the parties for the purchase and sale of said hydro-electric energy so produced by the irrigation district, to be approved by the Railroad Commission; or, in the absence of such contract, at a rate to be fixed by the Railroad Commission. There are other provisions in this contract not necessary to be considered.

The second contract between the parties executed upon the same date, and evidently a part of the same transaction, provided, in the first paragraph thereof, that as soon as the irrigation district had constructed, completed, and put in operation its hydro-electric energy plant, it would deliver and sell to the light and power corporation the entire electric output thereof, except such an amount as should be required for the operation of said plant and of the pumping plants of said district to be maintained and operated for storage, irrigation, and drainage purposes; and for which excess output of hydro-electric energy the light and power corporation agreed to pay according to meter measurements at a fair and reasonable rate to be fixed and determined by the Railroad Commission. It was further provided that this contract should remain and be in full force and effect for twenty years, with the right of renewal by the irrigation district for an additional twenty years upon giving a year's notice of such intended renewal. In other words, the light and power corporation was, by the first contract, to be compensated for its loss of generating power due to its transfer of its said water rights to the irrigation district, such compensation to be fixed according to the rate for hydro-electric energy purchased by it from the irrigation district to be fixed by the second contract. The effect of these contracts would be that when the irrigation district had built its dam and reservoirs for irrigation

purposes, and had installed its hydro-electric energy plant
in connection therewith, and had begun operations, and a
loss in power, and hence in output, of electric energy re-
sulted to the light and power corporation, it was to be
paid in money for such loss, and the amount of such pay-
ment was to be calculated upon, the basis of the rate fixed
by the Railroad Commission for such hydro-electric energy
as it was to purchase and receive from the irrigation dis-
trict's hydro-electric energy-producing plant.   There would
thus be a periodical balancing of accounts between the
two parties to these contracts, the light and power corpora-
tion being credited with its ascertained loss in water-power
and hence in hydro-electric energy and being debited with
the amount of its purchase of hydro-electric energy from
the plant of the irrigation district, both credit and debit
to be fixed according to the price established by the Rail-
road Commission for its said purchase of such hydro-electric
energy.

[1]   The parties to these two contracts have applied to
the Railroad Commission for the approval thereof, and, as a
necessary condition of such approval, for the fixation of the
rate to be paid by the light and power corporation for such
of the hydro-electric energy output of the proposed plant
of the irrigation district as it would be entitled to have
and to use under the terms of the second contract.   The
petition of the parties to these two contracts having been
filed with the Railroad Commission, the Water Users and
Taxpayers Association of Merced appeared before said
commission to object to the approval by it of said con-
tracts or the fixation of any rate to be paid by the light
and power corporation for the use of the hydro-electric
energy to be developed at the proposed but as yet uncon-
structed plant of the irrigation district.   Said objection was
based upon numerous grounds not necessary to be here
considered, but chiefly upon the grounds: First, that the
commission had no power to determine the rate to be paid
by the light and power corporation for the output of hydro-
electric energy of the proposed plant of the irrigation dis-
trict which was as yet nonexistent and the cost of con-
struction of which, and hence of the production of such
hydro-electric energy thereby, was not known or determinable
in advance of such construction; second, that the only proper

basis for the determination of such rate was that of the cost of construction and maintenance of said plant and of supplying such energy, and that this basis could not be available until such plant had been constructed and put in operation.

Upon the hearing of said application and the opposition thereto the Railroad Commission considered the evidence educed before it as to the several matters in issue, but particularly as to the proper basis for the fixation of the rate to be paid by the light and power corporation to the irrigation district for the hydro-electric energy which it would be entitled to receive under the second contract. Upon the submission of the matter, the commission gave its decision approving said contracts and fixing said rate, and in so doing the commission adopted as the basis for its fixation of the rate to be paid by the light and power corporation for said hydro-electric energy to be produced by the irrigation district, the cost to the light and power corporation of developing equivalent power itself either at its said plant or elsewhere, or of purchasing the same from similar hydro-electric energy-developing plants in that region.

The applicant herein seeks to have the order of the commission approving said second contract reviewed and annulled upon the grounds above stated as constituting its chief objection before the commission to the making of said order. In considering the merits of this contention, it is essential to have in mind the positions and relations of the several parties before the Railroad Commission and in this proceeding; and in so' doing, to take note of the fact that the only one of the two parties to the contracts in question over which the Railroad Commission has or had jurisdiction is the light and power corporation. **[2]** It is a privately owned public service corporation and as such is brought within the jurisdiction and control of the Railroad Commission under the Public Utilities Act. The proceeding before the commission was one involving, by the terms of the first of said contracts, the transfer by the light and power corporation of certain valuable rights and privileges of which it was the owner in the waters of the Merced River, and which were being utilized in the course of its production of hydro-electric energy at its plant upon said river for sale to its consumers. The propriety of such

a transfer upon any terms of a portion of its producing capital was, of course, a matter for supervision and approval by the Railroad Commission under the terms of said act.  This much is conceded by the applicant herein, both expressly and by the fact that it is not sought to have the action of the commission in approving the first of said contracts reviewed or annulled.  In addition to thus seeking to dispose of an essential portion of its working capital in the way of water rights and privileges, the light and power corporation was attempting to acquire by purchase a certain *quantum* of hydro-electric energy to be thereafter distributed by it to its consumers and which purchase the Railroad Commission had, under' the general provisions of section 31 of said act and also under the more particular provisions of section 36 thereof, the right to supervise.  The jurisdiction of the commission as to both these matters is not brought in question here.

As to the irrigation district, it is conceded that primarily the Railroad Commission has no jurisdiction over it or over the propriety or reasonableness of its contracts with relation to its properties, present or prospective, or over the terms of sale or other disposition of said product, since an irrigation district is a public agency in the nature of a municipal corporation and is not a privately owned public service corporation or a public utility in the sense in which these terms are used in the constitution or statutes of this state, and is not, therefore, as to its contracts or rates, within the jurisdiction or subject to the control of the Railroad Commission.  **[3]**  In the case of *City of Pasadena* v. *Railroad Commission,* 183 Cal. 562 [10 A. L. R. 1425, 192 Pac. 25], it was held that the provisions of the constitution authorizing the legislature to confer upon the Railroad Commission powers to supervise and regulate public utilities apply exclusively to private corporations and natural persons or associations of persons and do not include municipal corporations, even when engaged in the exercise of proprietary functions.  The principles therein enunciated have equal application to irrigation districts.

It will appear from the foregoing that the jurisdiction which the Railroad Commission has undertaken to exercise in regard to these two contracts between the light and power corporation and the irrigation district is to be called

in question only in so far as it affects the properties and agreements of the light and power corporation.

It is next to be noted that the proceeding before the Railroad Commission was not one for the regulation or fixation of rates as between the light and power corporation and its present or prospective consumers of hydro-electric energy. It was in its inception strictly a proceeding wherein the light and power corporation was seeking the approval by the Railroad Commission of its proposed sale of certain water rights and privileges constituting a portion of its working capital, and of its proposed purchase of a certain *quantum* of hydro-electric energy for future distribution. These two contracts were interrelated because the other party to each was the same, and also because the water rights and privileges which the light and power corporation proposed to sell were to be used in part for the production of the hydro-electric energy which it proposed to buy. From this view of the nature and scope of the proceeding before the Railroad Commission it will appear that the question as to the basis, amount, or reasonableness of the rates to be ultimately charged the consumers of the hydro-electric energy of the light and power corporation was only indirectly, and it may even be said remotely, involved; and this only because of the fact that the price which this public service corporation was to be permitted to pay for the *quantum* of hydro-electric energy to be supplied to it at some time in the future by the irrigation district according to the basis determined by these contracts might affect the rate at which its entire output of such energy was to be retailed to its customers, when such *quantum* so purchased by it came into being as a result of these agreements. Assuming, however, that this interest of the ultimate consumers of the product of the light and power corporation, though thus indirect and remote, was such an interest as would entitle them to call in question the action of the Railroad Commission in the premises, we shall consider the basis and soundness of their position as presented before the commission and as reiterated here.

[4] The contention of the applicant herein is that chiefly insisted upon before the Railroad Commission and, while amplified in its petition herein into several heads, is

reducible to a single proposition. It is that the commission had no power to determine the basis for the price to be paid by the light and power corporation for the hydro-electric energy to be purchased by it from the irrigation district to take into account properties and plant of the latter which were not in existence at the time of such determination, when the cost of their construction and of their output of hydro-electric energy could not be known. We are referred to various sections of the Public Utilities Act (Stats. 1915, p. 115) as supporting this contention. We have examined the various sections of said act to which we have been referred, and we find nothing therein which purports to place any such limitation upon the powers of the Railroad Commission in dealing with such matters as were presented in the proceeding before it. Section 36 of said act, which purports to empower the commission to hear and approve applications for the increase in the properties and equipment of public service corporations, places no such limitations upon its powers in that regard. Neither does section 51 of said act, which relates to the powers of the commission in the matter of the approval of transfers of the properties of public service corporations, attempt to hamper the scope of its investigations for the purpose of determining whether to grant or refuse such approval. Nor do the cases to which we have been referred by the applicant herein sustain its contention with respect to the limited powers of the commission in the above respects, since in each of said cases the questions discussed therein arose in direct controversies between public service corporations and their consumers of a particular product, wherein the cost of production of such product by such public service corporation was directly involved. This, as we have seen, is not such a proceeding, and the unreasonableness of attempting to apply the principles applicable to direct proceedings for the fixation of rates cannot be made more apparent than by a brief consideration of the respective positions of the parties to these contracts, as disclosed by the evidence educed before the commission.

It was disclosed by such evidence that the light and power corporation was, within the region in which it was operating, a growing concern with the demand upon it for the supply of electric energy to its customers steadily and

rapidly increasing to a degree requiring the extension of its facilities for the production of such energy. To meet this demand it must either itself construct additional dams and reservoirs and install additional appliances for the increase of its output in electric energy, or purchase such energy from other producing plants, in which latter eventuality it would be obliged to pay a rate predicated upon the cost of such product elsewhere. The commission took evidence as to the cost of the production of electric energy both in other plants of the light and power corporation and in the plants of other like producers of electrical energy in the general region of the activities of said corporation. It was thus able to ascertain approximately what the cost to the light and power corporation would be if it either undertook to produce the full amount of electric energy required to meet its increase in business, or to buy an equivalent amount from other like corporations within that region engaged chiefly in the production of the same commodity. Had this been the actual situation, it is perfectly apparent that the Railroad Commission would have had jurisdiction to adopt such a basis for the fixation of such rates under the powers conferred upon it by the provisions of the Public Utilities Act. It was also shown before the commission that the proposed production of hydro-electric energy on the part of the irrigation district would be in the nature of a by-product the main cost of the production of which would be that of the construction and operation of its dams for impounding and supplying water for irrigation purposes to its customers for that commodity within its district, and for which it would be compensated in its returns from said water users. It would therefore be in a position, upon the construction of its said works, to produce hydro-electric energy at a much lower cost to itself than could be done by other producers of a like commodity in the region producing the same as their chief activity and not as a mere by-product, and it would thus be able to dispose of the excess of its said by-product not required in connection with its main objects as a distributor of water at a greater profit to itself than that which would ordinarily be derived from the production and sale of the like commodity when produced elsewhere. This was, however, a fortunate condition operating to the advantage of

the irrigation district in its dealings either with the light and power corporation or any other purchaser of its said product; and as such it cannot be held to have deprived the commission of the power to adopt as a basis for the cost to the light and power corporation of said electric energy the price which it would otherwise have been obliged to pay had it purchased the same elsewhere.

There are certain other facts to be taken note of in this connection. The irrigation district, as a prerequisite to the establishment of its plant for the impounding and distribution of water upon the Merced River, was compelled to negotiate with the light and power corporation for the transfer to it of the superior rights of the latter in the waters of said river, and in the course of such negotiations to compensate the light and power corporation for whatever loss it should sustain in its lessened power of production of hydro-electric energy through the deprivation of these waters. The measure of this loss would in reason be the cost to the light and power corporation of replacing this lost energy either by purchasing it elsewhere at the market value thereof in the region, or by producing the same itself at substantially the cost of production by similar plants in that region. The irrigation district was able to consummate this negotiation by reason of the fact that by installation of appliances for the creation of hydro-electric energy at the point of location of its said irrigation works, it would be in a position to not only compensate the light and power corporation for its water rights thus needed in its own enterprise, but also to supply the latter with the increased amount of such energy which its own expanding business required. The interests of these two institutions, as disclosed before the Railroad Commission, were thus intermingled. It was essential to the irrigation district, on the one hand, to obtain the superior water rights and privileges which the light and power corporation held, and it was equally essential to the light and power corporation, on the other hand, to receive in compensation for the surrender of these rights and privileges the *quantum* of hydro-electric energy which it could have produced through their retention, and to be also able to obtain the added *quantum* of such energy which it was presently to need in its expanding business and which it would otherwise have to acquire

at the general cost of production in that region. The natural solution of such a situation was that of having the irrigation district install in connection with its water-impounding and distributing system the appliances required for the production of the *quantum* of hydro-electric energy which the light and power corporation was to lose and also the added *quantum* which it was presently to need. In the achievement of this twofold object, it was, of course, necessary for the irrigation district to dispose of its said product at a price which would yield it a profit justifying such additional expenditure. The water users of such district, who were also its organizers, would naturally expect such a price to be that obtainable for the like product in that region, regardless of the cost of its production as a mere by-product.

It would seem clear that under the foregoing situation and relation of the parties it would have been inequitable, if not entirely impracticable, for the Railroad Commission to adopt as the basis for the fixation of the selling price of the same product the mere cost of its production as a by-product. Such a basis would be clearly unfair to the light and power corporation as the basis for fixing the price to be paid to it for its water rights and privileges which the irrigation district was proposing to acquire not merely for the production of hydro-electric energy but for use in its general irrigation activities. Such a basis would seem to be even more manifestly unfair to the irrigation district as the basis of the selling price of its hydro-electric energy which it would otherwise be entitled to dispose of at the market price of such commodity in the region, regardless of the cost of its production as a by-product. The water users and the taxpayers creating and controlling the district would doubtless object to the adoption of any such basis, even to the extent of withholding their consent to the installation of the appliances necessary to the production of electric energy upon such a small margin of profit. The Railroad Commission was entitled to take into account all of the foregoing considerations in the adoption of a basis for the fixation of the price which the light and power corporation would be permitted to accept for the transfer of its water rights and privileges and, on the other hand, would be authorized to pay the irrigation district for its

proposed output of hydro-electric energy. Its discretion in that regard is beyond the power of review by this tribunal.

[4] The contention of the applicant herein that the powers of the Railroad Commission in the matter of the fixation of rates as between public service corporations and their consumers should be limited to facts and properties in existence at the time such powers are sought to be exercised has no application to the situation here presented. The Railroad Commission was not asked to fix any rates as between the light and power corporation and its customers in the proceeding before it. The problems involved in such a proceeding will not arise until such future time as it shall begin to receive the *quantum* of electric energy to be delivered to it under these contracts and shall begin to distribute the same to its consumers. If at such time a controversy should arise between it and its consumers regarding the reasonableness of its rates, the Railroad Commission will then and in a proper proceeding pass upon and determine the reasonableness of the rates to be charged upon such distribution. It is true that the question of the reasonableness of such future rates is, in a sense, indirectly involved in the present proceeding, since the price which the light and power corporation is required to pay for such of its hydro-electric energy as it is to eventually receive under these contracts will, to some extent, determine the rates at which it will dispose of its output derived from this source. The parties to these contracts have, however, apparently provided for this eventuality by the following proviso in the second contract between said parties:

"All electric energy to be sold and delivered hereunder shall be sold and delivered at a fair and reasonable rate to be fixed and determined by the Railroad Commission of the State of California, but inasmuch as irrigation district reserves the right to withhold from the effect and operation of this contract so much energy as it may require in and about said operations as more particularly set forth in the first paragraph of this contract and inasmuch as the rate to be fixed in the first instance shall be upon the assumption that the entire output of its hydro-electric generating plant will be delivered to power company, the parties hereto agree that the reservation and use of power for

any other purpose that the operation of said hydro-electric generating plant and storage, *or any other change in conditions that in the opinion of either party hereto affect the value of the energy delivered to power company hereunder,* shall be the proper cause and occasion for an application to the Railroad Commission of the State of California to alter and adjust rates then in existence so that the same shall thereafterwards fairly reflect the effect of the above changed conditions.''

Reading this clause in the contract in connection with the provisions of the Public Utilities Act investing the Railroad Commission with power to regulate the rates of public service corporations, it would seem that the rights of the future consumers of the product of the light and power corporation to be hereafter supplied as a result of the consummation of these agreements are not sufficiently shown to be affected by these proceedings as to justify a present objection to the same or to the action of the commission taken therein upon the sole ground of lack of jurisdiction.

[5]    It may be said in conclusion that the water users and taxpayers of the Merced Irrigation District have no such interest merely as such in these proceedings as would entitle them to bring in question the action of the Railroad Commission therein.    The irrigation district, as such, is not, as we have seen, subject to control by the Railroad Commission.    Nor is its power through its proper officials to enter into these contracts involved in this proceeding or affected by any action taken by the commission regarding the same.    All questions as to the powers of the officials of the irrigation district to enter into said contracts or to fix the terms thereof are purely questions of administration as between said district and the taxpayers and water users creating it and controlling its affairs, and with these the Railroad Commission has nothing to do and has done nothing.    The only interest which the water users and taxpayers within the said irrigation district, either individually or in association, could have in the instant proceeding or in any later proceeding for the fixation of rates to be charged by the light and power corporation might consist in the fact that some of these are or may become customers of said corporation and consumers of its product

at some future time when the reasonableness of its rates for its output of hydro-electric energy derived from sources which are not yet in being may be called into question. Assuming the possibility or likelihood of such an interest, it would still seem clear that the present assertion of the right on the part of the applicant herein to call in question the action of the Railroad Commission in approving the contracts in question is, to say the least of it, premature, and that whatever question may hereafter arise with respect to the fixation of rates to be charged by this public utility for the distribution of a product, the sources of which are not as yet in being, were not presented in the proceeding before the Railroad Commission, and were not acted upon by that body, and hence are not the subject of review in the present proceeding before this court.

Writ denied.

Richards, J., *pro tem.*, Shaw, C. J., Sloane, J., Waste, J., Wilbur, J., Shurtleff, J., and Lawlor, J., concurred.