[Sac. No. 4752. In Bank.—March 1, 1934.]

MERTON CRUM et al., Respondents, v. MT. SHASTA POWER CORPORATION (a Corporation), Appellant.

WILLIAM J. ALBAUGH, Respondent, v. MT. SHASTA POWER CORPORATION (a Corporation), Appellant.

William B. Bosley, Athearn, Chandler & Farmer, Frank R. Devlin, Chenoweth & Leininger and Thomas J. Straub for Appellant.

Garret W. McEnerney, as *Amicus Curiae* on Behalf of Appellant.

Jesse W. Carter, Arthur C. Huston and Annette Abbott Adams for Respondents.

THE COURT.—A rehearing was granted in this case to give further consideration to two points discussed in our former opinion. The first point has to do with the proper interpretation of the case of *Joerger* v. *Mt. Shasta Power Corp.*, 214 Cal. 630 [7 Pac. (2d) 706], and the application of the rule of that case to the facts of this case. Upon further consideration we are of the opinion that the discussion of the Joerger case was not necessary to the

opinion and may be stricken therefrom without in any way affecting the result. The opinions of the District Courts of Appeal in these cases have clearly established the law of the case to be that the plaintiffs are entitled to damages. To the discussion contained in our former opinion on this point, we add the following observation.

 Assuming, but not deciding, that defendant's use of the water is in the exercise of its riparian rights, but constitutes an excessive use of the waters of Fall River, plaintiffs could not, as contended by defendant, secure an apportionment of said waters. This is so for the reason that a public use has attached to the entire flow of Fall River. If plaintiffs should bring an action for apportionment they would be immediately met with the defense that a public use had attached to the entire flow. The same reasons that prevent the plaintiffs from securing an injunction in the present cases would prevent them from securing an apportionment.

The second point requiring further discussion is whether the stipulation offered by defendant should have been admitted into evidence. This point will be more fully discussed hereafter.

We are fully in accord with the other portions of our former opinion. We therefore adopt as part of our opinion on rehearing, the following portions of our former opinion (86 Cal. Dec. 235 [24 Pac. (2d) 801]):

"These two cases are now before the appellate courts for the second time. On the first appeals, the District Court of Appeal reversed judgments in favor of the respective plaintiffs. (*Crum* v. *Mt. Shasta Power Corp.*, 117 Cal. App. 586 [4 Pac. [2d] 564]; *Albaugh* v. *Mt. Shasta Power Corp.*, 117 Cal. App. 612 [4 Pac. [2d] 574].) Petitions for hearing in this court were denied. After the reversals, the two above cases were consolidated for trial, and were retried before the court sitting with a jury. The jury brought in a verdict in favor of Crum in the sum of $32,100, and in favor of Albaugh in the sum of $96,300. Defendant has separately appealed from each judgment.

"The controversy between these parties is of long standing, and grows out of the diversion by the defendant for power purposes of substantially all of the waters of Fall river above the confluence of that river with the Pit river.

The Fall river empties into the Pit river in the northeastern section of Shasta county. The two streams come together at approximately right angles. The quantity of water flowing in Fall river in the summer time is much larger than the quantity flowing in the Pit river in those months. Pit river is a flashy stream with a maximum flow of 10,000 second feet in the winter months, and a minimum flow at Young's Falls of as little as 3 second feet in the summer months. The flow of Fall river, on the other hand, is much more uniform. It has a maximum flow of about 1800 second feet, with a minimum of about 1000 second feet.

"Plaintiffs' lands are located on opposite sides of the Pit river on what is referred to as Pitville pool, about five miles upstream from the confluence of the two rivers. Crum owns about 116 acres and Albaugh owns about 400 acres, both areas being adjacent to the pool on opposite sides thereof.

"It is because of the physical characteristics of the Pitville pool that this action has arisen. About 500 feet downstream from the confluence of the two rivers, there is a natural rock reef or barrier extending nearly across the bed of the Pit river. This rock reef acted as a partial natural dam and caused the waters of the two streams to back up, creating Pitville pool. About 8½ miles upstream from the rock reef, on the Pit river, is to be found Young's Falls, located at the town of Pitville. The stream from Young's Falls down to the rock reef is known as the Pitville pool. Plaintiffs' civil engineer, Mr. Mau, testified as to making a survey of the pool. He made a profile of the pool, which was introduced into evidence as plaintiffs' exhibit 3. From this exhibit and from the testimony of Mau interpreting it, it appears that the maximum depth of this pool opposite Albaugh's lands is over 27 feet lower than the top of the rock reef, and that the maximum depth of the pool opposite Crum's lands is over 19 feet lower than the top of the rock reef. This profile map demonstrates that the bed of the Pitville pool from the rock reef to Young's Falls is below the level of the top of the rock reef and runs slightly downhill from the reef. Stated another way, the bed of the pool from Young's Falls to the rock barrier runs slightly uphill and at no place appears to be

within about 7 feet of the height of the rock reef. This witness and others testified that the surface of the pool is practically level. Several of plaintiffs' witnesses testified that there was no noticeable current and, in fact, no current in the pool in the summer months; that, in the absence of a wind, objects thrown into the pool would remain approximately stationary for many hours.

■ "This physical condition, according to plaintiffs' theory, makes their lands riparian to Fall river in the summer months, although their lands are located more than five miles from where the Fall river empties into the Pit river. We agree with plaintiffs that the evidence introduced on this trial, as well as the law of the case, as established on the prior appeals, fully establishes that Pitville pool is a natural reservoir, which is filled with water in the summer months from both the Pit and Fall rivers, and that in those months plaintiffs' lands are riparian to both streams. We are of the opinion that the evidence establishes that Fall river, in the summer months, in a state of nature, contributed a large quantity of water to this pool, which water mingled with and became an inseparable part of the *corpus* of the water in the pool. In other words, Pitville pool is a miniature lake in the summer months, its waters in that period consisting of Pit and Fall river waters, mingled indiscriminately. We cannot add to what the District Court of Appeal said on this point on the prior appeal in the Crum case. We adopt as a part of this opinion the following portions of the Appellate Court's decision (117 Cal. App., at p. 596):

■ " 'It may seem like fiction to say that land which is located on a pond formed by a dam in the bed of one stream, may still be riparian to another stream which is five miles distant from this land. While Fall river contributes a substantial quantity of water which mingles with and remains in Pitville pool, this pond may be deemed to be an inlet or arm of Fall river, in spite of the fact that there is no current in the pool by means of which the water of the last-mentioned stream may be actually traced to the locality of the land. It is not essential that there shall be a current of the stream which actually washes the shores of plaintiff's land. It is sufficient if the waters of the respective streams mingle in the same reservoir to form the

*corpus* of the same pool. The pond then becomes a basin which is tributary to both streams. This situation may then make plaintiff's land riparian to both rivers. The case of *Turner* v. *James Canal Co.*, 155 Cal. 82 [132 Am. St. Rep. 59, 17 Ann. Cas. 823, 22 L. R. A. (N. S.) 401, 99 Pac. 520, 522], is authority for this exact conclusion. It is there said:

" ' "The right of a riparian owner to the use of water bordering upon his land does not, as plaintiffs contend, arise from the fact that the water is flowing and that any part thereof taken from the stream is immediately replaced by water from the current above it. It comes from the situation of the land with respect to the water, the opportunity afforded thereby to divert and use the water upon the land, the natural advantages and benefits resulting from the relative positions, and the presumption that the owner of the land acquired it with a view to the use and enjoyment of these opportunities, advantages, and benefits. (*Duckworth* v. *Watsonville·etc. Co.*, 150 Cal. 526 [89 Pac. 338].) Out of regard to the equal rights of others whose lands may abut upon the same water, the law has declared, as will hereafter be more fully shown, that the use of the water for irrigation, so far as it affects the right of others similarly situated, must be reasonable, and must be confined to a reasonable share thereof. But with this common limitation, the right to use water upon adjoining land applies as well to the water of a lake, pond, slough, or any natural body of water, by whatever name it may be called, as to a running stream . . . We have never heard that riparian rights depended upon the character of the current in the water upon which these rights extend. They exist if the water be an artificial pond made by a dam in a water course, as well as when it is an unobstructed running stream."

" 'So long as the bulk of water from Fall river remains impounded in Pitville pool, we may assume, upon the reasoning of the last-mentioned case, that plaintiff's land is riparian to Fall river.

■ " 'It must be conceded, however, that the same situation does not prevail in times of flood water during which these two rivers rush down over the dam with mighty velocity at a depth of many feet. It is apparent

that under such conditions very little of the water of Fall river remains impounded in the pool. During the season when the flood water and current of Pit river carry Fall river water down over the dam, the plaintiff's land is not riparian to Fall river. It follows that while the plaintiff's land may be riparian to Fall river during times of low water in the summer, it is not riparian to that stream during the season of flood water in the winter months.

" 'The appellant suggests upon rehearing that this court has misconstrued the application of the case of *Turner* v. *James Canal Co.*, 155 Cal. 82 [132 Am. St. Rep. 59, 17 Ann. Cas. 823, 22 L. R. A. (N. S.) 401, 99 Pac. 520, 524], by holding that because the Pit and Fall rivers both contribute to the supply of water in the Pitville pool the land of plaintiff would become riparian to Fall river during the season when its water became an inseparable part of the *corpus* of that pond. It is pointed out that the Supreme Court held that the Fresno slough was an arm or inlet of the San Joaquin river only when the water from Kings river was not flowing into the slough; that the court did not hold that the land which was situated on the slough was riparian to both rivers at the same time. It is therefore argued that this court erred in holding that the plaintiff's land was riparian to both Fall and Pit rivers at the same time. We have re-examined that case with great care and have concluded there is nothing therein contained which is in conflict with what was said in our former opinion *and which is herein adopted as the law of this case respecting that subject.'* (Italics ours.)

"Under the above reasoning, which has become the law of the case, we take it to be settled that plaintiffs' lands, in the summer months, are riparian to both Pit and Fall rivers.

"The defendant is a hydroelectric power company. It owns all the land on both sides of and riparian to Fall river, from where it empties into the Pit river, to a point about two miles upstream. It also owns all the land on both sides of Pit river and riparian thereto from a point about 600 feet above the juncture of that stream with the Fall river, down the Pit river for about seven miles. At this lower point on Pit river is located defendant's power plant. In 1920, defendant started construction of a dam,

penstock and tunnel on the Fall river about one mile above its juncture with the Pit, for the purpose of diverting for power purposes substantially the entire flow of Fall river to the power plant on Pit river. By means of these diversion works, the entire flow of Fall river, with the exception of a small quantity allowed to remain for the use of certain lower claimants other than the plaintiffs, was diverted from a point above the confluence of the two streams to a point about seven miles below. Thus the waters of Fall river were wholly and entirely diverted away from Pitville pool.

"The diversion works and power plant were completed on September 30, 1922. The entire flow of Fall river was diverted on that day for a trial run. Immediately the level of the water in Pitville pool was lowered about five feet. The next day the water of Fall river was turned back by defendant into its natural channel, and the pool immediately was filled to its normal depth. To give an idea of the relative amounts of water contributed by each stream to the waters of the pool, plaintiffs' engineer Mau testified that in the summer months, if the pool were empty, it would take about 100 days for the flow of Pit river to fill the pool, while the normal flow of Fall river would fill the pool in one day.

"As already mentioned, a short distance downstream from the confluence of the two rivers is located a natural rock reef, which serves as a natural dam and holds a portion of the waters of the two rivers in Pitville pool. This rock reef is on land owned by defendant. On the western end of this rock barrier was a large crevice some 8 feet in depth, which permitted a considerable quantity of water from the pool to escape down the Pit river. Some time between September, 1922, and January, 1923, the defendant constructed a concrete dam across the crevice in the natural rock dam, thus connecting the rock barrier with the western shore of Pit river. In January of 1923 defendant again diverted all of the waters of Fall river away from Pitville pool. The natural dam, as supplemented by the artificial dam, served to impound effectually the waters of Pit river, so that the level of Pitville pool was maintained at the same height as before the diversion. Sufficient water has always come down Pit river and its tributaries to keep the pool

full, and to keep the water running over the dam. It is a conceded fact that from the date of the diversion to the date of the last trial in 1932, the level of Pitville pool has thus been maintained as it was before the diversion. In other words, plaintiffs at all times since the diversion have had access to the same *quantity* of water as existed before the diversion.

"Plaintiffs commenced the present action in 1923, two causes of action being alleged. Plaintiffs alleged their ownership of lands on Pitville pool; that said lands were riparian to Fall river; that defendant had wrongfully diverted the entire flow of Fall river; that by reason thereof plaintiffs have been deprived of their riparian rights in and to the waters of Fall river. The first count of the complaint prayed for an injunction, the second count for damages. Defendant answered denying that plaintiffs' lands were riparian to Fall river. This issue has been determined adversely to defendant. Defendant also alleged that it was diverting the water in the exercise of its riparian right; that it had constructed the dam at the rock reef; and that since its construction the level of the water had been maintained. As a separate defense, defendant set forth that it was using the waters of Fall river for the development of electric energy for the purpose of sale to the public; that plaintiffs knew of the construction of the power plant and permitted its construction without objection; that plaintiffs are estopped from preventing the diversion by reason of the fact that a public use had attached to the waters diverted. On the issues thus formed, the cases went to trial, resulting, as already stated, in judgments in favor of plaintiffs. While the appeals were still pending in the District Court, plaintiffs abandoned their claim for an injunction. The Appellate Court reversed the judgments and sent the cases back for retrial. On the retrial the pleadings were not amended, except as to the prayer of the answer. The original prayer was stricken and, in lieu thereof, there was inserted a prayer asking for (1) a determination of the respective rights of the parties in and to the water, and (2) a determination that defendant's diversion and use of the waters was not in the exercise of its riparian rights.

"One other occurrence preceding the present trials must be referred to. After the first appeals had become final

and the *remittitur* filed in the lower court, it was discovered that defendant as the successful party on appeal had been awarded its costs. Plaintiffs thereupon moved in the Appellate Court to recall and modify the *remittitur* to allow plaintiffs their costs, on the theory that the suits were inverse condemnation suits and that, therefore, the condemnees were entitled to costs. The Appellate Court held the actions were not actions in eminent domain and that, therefore, plaintiffs were not entitled to costs. (*Crum* v. *Mt. Shasta Power Corp.*, 124 Cal. App. 90 [12 Pac. [2d] 134]; *Albaugh* v. *Mt. Shasta. Power Corp.*, 124 Cal. App. 779 [12 Pac. [2d] 137].) These last decisions were not rendered until the day after the jury brought in its verdict on the retrial of these cases, so that the trial court did not have the benefit thereof on the retrial.

"One of the most perplexing problems presented on the present appeal is to determine just what the Appellate Court decided on the prior appeals, and to determine just what was there determined to be the law of the cases. From the quotation above, it appears that the Appellate Court clearly held that plaintiffs' lands were riparian to Fall river in the summer time. It was also held that defendant's use of the water of Fall river would not ripen into a right by adverse possession, evidently because defendant disclaimed any intent to appropriate the water and claimed to be diverting it in the exercise of its riparian right. The effect of the public use having attached to the water diverted was not discussed. The Appellate Court also pointed out that the action was not one for an apportionment of the waters between riparian owners, but an action by one riparian owner against the other for injury to the former's usufructuary title to the waters of Fall river. After pointing out that a riparian owner has the right to have the water flow past his land in its usual course, the court stated (117 Cal. App. 603):

" 'It follows that a diversion of that river [Fall river] destroys the natural condition which makes the land bordering on Pitville pool riparian to that stream. If the contribution of Fall river water to Pitville pool is beneficial to the land of plaintiff, then he is afforded a remedy for its withdrawal, by means of a suit for damages or for injunctive relief. He has seen fit to rely upon a suit for dam-

ages. . . . Assuming the evidence does adequately show that the water which is normally contributed to Pitville pool is beneficial to the land of plaintiff which is located thereon, the plaintiff would be entitled under the pleadings in this case to whatever damages he has suffered from the diversion of the stream.'

██ "It is true that the Appellate Court also stated (117 Cal. App., at p. 599):

" 'The appellant, however, specifically disclaims title to this diverted water by adverse possession. It asserts the right to divert and use this water as a riparian owner thereof for the beneficial purpose of manufacturing hydroelectric power only to the extent that other riparian owners are not in need of the water. It has been specifically determined by the Supreme Court in the case of *Fall River Valley Irrigation Dist.* v. *Mt. Shasta Power Corp.*, 202 Cal. 56 [56 A. L. R. 264, 269, 259 Pac. 444], that the appellant's use of the water of Fall river was for proper riparian and beneficial purposes.'

"Appellant strenuously contends that this language necessarily means that defendant's entire diversion of the waters of Fall river away from Pitville pool is a proper riparian use and that plaintiffs' remedy, if any, is an action to apportion. In view of the direct and unequivocal holding of the Appellate Court that plaintiffs herein are entitled to damages caused by the diversion, we cannot interpret the last-quoted statement to mean that defendant's diversion of the entire stream constitutes a proper reasonable riparian use, and that, therefore, plaintiffs are precluded from recovering any damages caused by the diversion. Not only would such an interpretation be contrary to and inconsistent with the holding that plaintiffs are entitled to damages, but, if the Appellate Court had so intended, it would have directed judgment to be entered for defendant, there being no further issues to be determined. But this it did not do. A fair reading of the entire opinion clearly indicates that the Appellate Court reversed the trial court on the issue of damages alone, and intended a retrial on that issue. As we interpret the last-quoted statement, all that was intended thereby was that the use of water for power purposes under a proper state of facts is a proper riparian use. With that doctrine, we have no quarrel. ██ The

courts of this state have long recognized that a riparian owner in the proper exercise of his riparian right may use the water as a motive power to propel machinery subject only to the domestic uses of lower riparians. However, this. does not mean that the use of such waters for power purposes gives any riparian owner any greater right than any other riparian use would give him. The language above referred to does not mean that one riparian in the exercise of his riparian right can divert the water entirely around an opposite riparian owner, when and if such diversion results in substantial damage to the opposite owner. We are clearly of the opinion that under the issues presented in this case, and under the law of this case as enunciated by the Appellate Court, plaintiffs are entitled to damages, if any substantial damage or diminution in the value of their lands has resulted from the diversion, to which a public use has attached.

* * * * * * * * * * *

■■■ "Under the theory enunciated by this court in the recent case of *Gin S. Chow* v. *City of Santa Barbara,* 217 Cal. 673 [22 Pac. (2d) 5], in interpreting article XIV, section 3, of the state Constitution, a riparian is not entitled to damages, even as against an appropriator, simply because his usufructuary title to the water has been interfered with. It is incumbent upon him to show substantial actual or prospective damage therefrom.

"We now turn to a discussion of the question as to whether the evidence here shows any substantial damage to or diminution in the value of plaintiffs' lands, caused by the diversion and the construction of the dam. Under the facts of this case, such damages could have arisen in one of two ways. First, the diversion might have *diminished the quantity* of water in Pitville pool to a level where plaintiffs' actual or prospective needs were interfered with; or, secondly, the diversion and construction of the dam might have *affected the quality of the water* in Pitville pool to such an extent that the value of plaintiffs' lands was adversely affected to a material degree.

"We turn first to a discussion of the effect of the diversion on the quantity of water in the pool. The evidence shows that when the waters of Fall river were first diverted on September 30, 1922, the level of Pitville pool was lowered

from four to five feet. However, the level was restored by the construction of the dam at the rock reef below plaintiffs' lands. There is no dispute but that since the construction of the dam there has been exactly the same quantity of water in the pool as was there before the diversion. It must be remembered that under the facts and law of this case Pitville pool is in legal effect a lake or reservoir with two sources of supply—Pit river above the pool, and Fall river. The pool has one outlet—Pit river below the pool. One source of supply has been taken away by the diversion and by the public use attaching thereto. But, due to the construction of the dam, the level of the pool has been maintained exactly as it was before the diversion. The only difference is that now the pool is filled solely with Pit river water instead of a mixture of Pit and Fall river waters. This water, which is supplied in lieu of Fall river water, is not foreign water, but water from one of the natural sources of Pitville pool, namely the Pit river.

"During the course of the trial, defendant offered to stipulate as follows:

" 'Mt. Shasta Power Corporation, defendant herein, in view of the decision of the District Court of Appeal in the above entitled cause, hereby admits that said plaintiff, by virtue of his ownership of the lands described in his complaint and riparian to that part of Pit river known and designated as the Pitville pool, is entitled to the maintenance of the water in that pool, at all times, substantially at its natural level as such level would be if the waters of Fall river should continually flow into it at the natural confluence of said rivers.

" 'This defendant asserts that, by virtue of its ownership of the riparian rights and the riparian lands described in its answer, it has the right to continue to divert and use at all times the waters of Fall river as it is now doing for the operation of its Pit No. 1 Power Plant, provided only that its diversion and use of such water shall not actually result in substantially lowering the level of the water in said Pitville pool below its aforesaid natural level.

" 'This defendant declares that it does not now intend and never has intended or purposed to infringe or violate the right of said plaintiff to the maintenance of the aforesaid natural level of the water in said pool; and does hereby

undertake and promise to maintain and operate the dam which it has heretofore constructed at the rock reef in the channel of said Pit river, a short distance below the natural confluence therewith of Fall river, and to maintain the level of the water in said Pitville pool substantially at its aforesaid natural level and not lower than the top of the aforesaid dam by means of its maintenance and operation of said dam and by discharging or causing to be discharged into said Pitville pool so much of the water naturally flowing in said Fall river and its tributary, Tule river, as may be required for that purpose from time to time, so long as this defendant shall continue to divert water from Fall river above its natural confluence with Pit river; and does hereby irrevocably consent that the judgment to be entered herein shall require this defendant to maintain and operate said dam and to maintain the natural level of the water in said Pitville pool as it has herein undertaken and promised to do.

" 'In witness whereof said Mt. Shasta Power Corporation has caused its corporate seal to be hereunto affixed and has caused its corporate name to be hereunto subscribed by its officers thereunto duly authorized on this 27th day of May, 1932.'

"During the course of the argument over this stipulation, counsel for defendant further agreed that if the waters of Pitville pool ever became insufficient to maintain the level of the pool, defendant would agree that Fall river water should be released sufficient to keep the level of the pool at the height existing before the diversion. The trial court refused to admit this stipulation into evidence, or to instruct the jury in reference thereto. The trial court's refusal was based on the theory that the stipulation was ineffectual for any purpose unless the plaintiffs agreed thereto."

It is to be noted that this stipulation contains two very important concessions on the part of the defendant. First, it is agreed, that defendant will maintain the level of the pool by a release of Fall river waters if necessary; and second, it is agreed that the defendant will always maintain the dam and that the judgment may contain a provision to that effect.

As to the first concession, it is our opinion that it was beyond the power of the defendant to make without

first securing the consent of the railroad commission. The evidence clearly shows that defendant is a public utility and that a public use has attached to all but an immaterial portion of the flow of Fall River. For the ten-year period immediately preceding the trial of this action substantially the entire flow of Fall River has been diverted by defendant and devoted to a public use. In effect the stipulation amounts to an offer to reconvey a portion of this water to plaintiffs. This, defendant cannot do without the consent of the railroad commission. A public utility cannot thus convey its property which has been dedicated to a public use without the consent of that commission. Section 51 of the Public Utilities Act (Stats. 1927, p. 78) expressly provides:

"No public utility shall henceforth sell, lease, assign, mortgage, or otherwise dispose of or encumber the whole or any part of its railroad, street railroad, line, plant, system, *or other property necessary or useful in the performance of its duties to the public* . . . without first having secured from the railroad commission an order authorizing it so to do. Every such sale, lease, assignment, mortgage, disposition, encumbrance, merger or consolidation made other than in accordance with the order of the commission authorizing the same shall be void. . . . "

There are many cases holding, in accordance with that section, that a public utility cannot convey or transfer its property which has been dedicated to a public use without the consent of the railroad commission. (*Napa Valley Elec. Co.* v. *Calistoga Elec. Co.*, 38 Cal. App. 477 [176 Pac. 699]; *Water Users etc. Assn.* v. *Railroad Com.*, 188 Cal. 437 [205 Pac. 682]; *Baldwin* v. *Railroad Com.*, 206 Cal. 581 [275 Pac. 425].)

Appellant relies on *Collier* v. *Merced Irr. Dist.*, 213 Cal. 554 [2 Pac. (2d) 790], and *Colorado Power Co.* v. *Pacific Gas & Elec. Co.*, 218 Cal. 559 [24 Pac. (2d) 495], as establishing a contrary doctrine. It is true that those cases recognized that in water cases a defendant may minimize the damages by guaranteeing a water supply to the plaintiff, but that is as far as the rule established by those cases goes. The Collier case did not involve a public utility so that the consent of the railroad commission was not required. In the Colorado Power Company case, although the defendant

was a public utility, it does not appear that the point here involved was discussed or mentioned. That case cannot, for that reason, be considered as authority on the point. We emphasize the fact that the stipulation here involved was offered after the public use had attached. We, therefore, hold that the trial court properly excluded this part of the stipulation from consideration.

However, this reasoning does not apply to the second concession contained in the stipulation, that is, the guarantee to maintain the dam. Such a guarantee was well within the powers of the company to make and in our opinion should have been admitted by the trial court. The gravity of this error in refusing to permit the jury to consider this guarantee becomes apparent when the peculiar facts of this case are considered. The evidence shows that since the construction of the dam the flow of Pit River at all times has been more than sufficient to keep Pitville Pool at the level that existed before the diversion. A period of about ten years has elapsed since the construction of the dam, and during all that period the pool has been maintained at its old level. Plaintiff as far as quantity of water is concerned has failed to show any damage actual or prospective by reason of the diversion, provided the dam is maintained. This the defendant offered to do and offered that the judgment should so provide. It was error of a most serious nature to exclude from the jury's consideration this portion of the stipulation.

The seriousness of the error is made evident when the form of the hypothetical question submitted to plaintiffs' value witnesses is considered. By that question the witnesses were told that after the diversion "the defendant constructed a concrete dam and works at the point known as the rock reef and that thereafter the Pit river pool was restored to its former level and that said level has since been maintained". The witnesses were not told that defendant had agreed to stipulate that it would continue to maintain the dam. The hypothetical question also told the witnesses that after the diversion and before the construction of the dam the level of Pitville pool had been lowered four to five feet. Without a guarantee of the future maintenance of the dam it is obvious that the value witnesses were forced to consider that plaintiffs' rights as to quantity of water

were uncertain. The cross-examination of these value witnesses indicates that such was the fact. This was error and requires a reversal on the issue of damages alone.

On the other issues involved in this case the following portions of our former opinion are pertinent and are hereby adopted as a portion of the opinion of this court on rehearing (86 Cal. Dec. 248, 249 [24 Pac. (2d) 801]):

"However, although it is true that under the facts of this case plaintiffs have not or will not be damaged as to the quantity of water in the pool, it does not necessarily follow that they have not been damaged in other respects. Under the California authorities, and under the law of these cases as enunciated on the former appeals, a riparian owner, even as against another riparian, is entitled not only to an undiminished flow of water, except as reduced by the reasonable use of other riparians and prior appropriators, but also to a substantially unpolluted stream. The riparian owner is entitled not only to the same quantity of water, but also to the same quality of water, provided by nature in the stream. (*Crum* v. *Mt. Shasta Power Corp.*, 117 Cal. App., at p. 606 [4 Pac. (2d) 564].) We are of the opinion that the evidence in the present case offered on behalf of plaintiffs clearly shows that the quality of the water in Pitville pool has been materially impaired by the diversion and by the construction of the dam. The evidence shows, without conflict, that the waters of Fall River have always been clear and pure, while the waters of Pit River have always been dark and murky. The evidence likewise shows that before the diversion the waters of Fall River rushed down into Pitville pool with a minimum flow of 1,000 second-feet. The Fall River waters, as we have already held, mingled with the dark murky waters of Pit River to form the pool. The jury could have reasonably inferred that the Fall River waters freshened the water in the pool. Since the diversion, the freshening effect of the Fall River waters has been lost. Moreover, by the construction of the dam, obviously the flow of water through the crevice in the rock reef has been stopped, resulting in the Pit river water backing up. There was ample evidence introduced on behalf of plaintiffs to show that since the diversion the waters of Pitville pool have become stagnant; that the pool in the summer months is now covered with weeds, slime and moss;

and that a very undesirable odor now emanates from the pool, which is obnoxious to the senses for a distance of one-half mile from the water. There is also some evidence that since the diversion cattle will not drink the polluted water. There is ample evidence from which the jury could have found that these conditions did not exist before the diversion, and from which the jury could have inferred that the changed conditions were caused by the diversion and by the construction of the dam. It hardly need be added that if such changed conditions resulted in a material impairment of the value of plaintiffs' lands, plaintiffs may recover therefor.

"Appellant contends that the question of pollution cannot be considered for the reason that the former appeals established as the law of the case that there was no pollution. We do not so interpret the Appellate Court opinion. All that the Appellate Court directly held was that there was no finding that the changed conditions were the result of the diversion. It is true that by way of *dicta* the court held that even if a certain finding could be so construed, 'there is no substantial evidence to support a judgment of damages based upon the pollution of the Pitville pool caused by the diversion of Fall river'. It is obvious that the above statement had reference to the facts as shown on the prior trial. On this trial the evidence was not the same as on the prior trials. On the present trial, additional witnesses on the question of pollution were called, and their testimony, and the testimony of the witnesses called on both trials, was substantially stronger than was produced on the former trials. It is obvious, therefore, that the rule of the law of the case has no application."

However, from what has been said, we do not intend to foreclose the plaintiffs on a retrial from making a further showing, if they can do so, that the offer of the defendant to maintain the dam at the rock reef and the maintenance thereof as promised will not effectually maintain the natural level of the water in the Pitville pool without discharging therein a portion of the water of Fall River. It is obvious that no useful purpose would be served in retrying all the issues in this case. The only issue requiring a further trial is the issue of damages.

For the foregoing reasons the judgments appealed from are and each of them is hereby reversed and the cases remanded for a new trial on the issue of damages alone and in accordance with the views herein expressed. Both sides to bear their own costs on this appeal.

Preston, J., and Langdon, J., deeming themselves disqualified, did not participate herein.

Rehearing denied.

Preston, J., and Langdon, J., deeming themselves disqualified, did not participate therein.