[Sac. Nos. 5062, 5063 (Consolidated Cases). In Bank. — October 28, 1937.]

WILLIAM J. ALBAUGH et al., Respondents, v. MT. SHASTA POWER CORPORATION (a Corporation), Appellant.

[Sac. Nos. 5066, 5067, 5068 (Consolidated Cases). In Bank.—October 28, 1937.]

RODERICK McARTHUR et al., Respondents, v. MT. SHASTA POWER CORPORATION (a Corporation), Appellant.

754

William B. Bosley, Athearn, Chandler & Farmer, Chenoweth & Leninger and Thomas J. Straub for Appellant.

Carter & Barrett and Huston, Huston & Huston for Respondents.

CURTIS, J.—The above five cases, consolidated for trial as indicated in the title, are companion cases, each having been instituted by the named plaintiffs against defendant Mt. Shasta Power Corporation. After trials before juries, separate and substantial judgments were entered in favor of each of the plaintiffs, from which judgments defendant has perfected these appeals. Except that the tracts of land involved in each action and the amounts of the respective verdicts are different, it is admitted by all concerned that substantially the same questions of fact and of law are involved in all of these appeals. For that reason one opinion will suffice to determine the issues herein presented.

The controversy between respondents and appellant is of long standing, and has several times received consideration in this and the appellate court. The Crum and Albaugh cases have been before this court and the District Court of Appeal on three prior occasions. In *Crum* v. *Mt. Shasta Power Corp.*, 117 Cal. App. 586 [4 Pac. (2d) 564], and *Albaugh* v. *Mt. Shasta Power Corp.*, 117 Cal. App. 612 [4 Pac. (2d) 574], judgments in favor of the two named plaintiffs were reversed, and the actions remanded for new trials. After the issuance of the *remittiturs* in the above cases Crum and Albaugh moved to recall the *remittiturs* for the purpose of assessing costs to the appellant, Mt. Shasta Power Corporation. These motions were denied with opinions by the appellate court—*Crum* v. *Mt. Shasta Power Corp.*, 124 Cal. App. 90 [12 Pac. (2d) 134]; *Albaugh* v. *Mt. Shasta Power Corp.*, 124 Cal. App. 779 [12 Pac. (2d) 137]. Thereafter these two actions were consolidated and retried, again resulting in substantial judgments for plaintiffs. Upon defendant's appeal, again the judgments were reversed and the causes remanded for retrials on the issue of damages alone—*Crum and Albaugh* v. *Mt. Shasta Power Corp.*, 220 Cal. 295 [30 Pac. (2d) 30].

The three McArthur cases have been before this court on one prior occasion. Upon appeals by the defendant from substantial judgments in favor of each of the McArthurs, the judgments were reversed (largely on the authority of 220 Cal. 295), and the causes were remanded for new trials on the issue of damages alone—*Anna McArthur* v. *Mt. Shasta Power Corp.*, 3 Cal. (2d) 704 [45 Pac. (2d) 807]; *Roderick McArthur* v. *Mt. Shasta Power Corp.*, 3 Cal. (2d) 765 [45 Pac. (2d) 816]; *Luther McArthur* v. *Mt. Shasta Power Corp.*, 3 Cal. (2d) 766 [45 Pac. (2d) 816] (the last two opinions being based on the Anna McArthur opinion).

In view of these prior opinions, in several of which the facts giving rise to this controversy were reviewed at length, no useful purpose would be served in again setting forth those facts in detail. Suffice it to say that each plaintiff is the owner of lands fronting on and riparian to Pitville Pool. This pool extends from Young's Falls, where the Pit River flows into it, for a distance of about eight and one-half miles to a rock reef. After passing the rock reef Pit River continues on, being the outlet of the pool. The pool has a width of about 145 feet. About 500 feet above the rock reef, Fall

River, in its natural state, also flowed into the pool, and, as held on the prior appeals, this river, in the summer months, contributed a substantial amount of water to that impounded in the pool. Appellant has constructed a large hydro-electric power plant on the Pit River about seven miles below the rock reef. To operate this plant, in 1922, appellant constructed certain diversion works in Fall River about two and one-half miles upstream from where that river, in its natural state, emptied into Pitville Pool. Since 1922, by means of these diversion works, appellant, for power purposes, has diverted substantially the entire flow of Fall River away from the pool to its power plant located on Pit River downstream from the rock reef. It should also be mentioned that appellant owns substantially all of the riparian rights from its diversion works on Fall River down to its power plant on Pit River.

When Fall River was first diverted it resulted in immediately lowering the level of the water in Pitville Pool about four feet. In an attempt to remedy this depletion in the water supply of the riparians on the pool, appellant, in 1923, constructed a dam at the rock reef for the purpose of impounding the waters of the pool and to return them to their former height. Appellant has agreed to permanently maintain this dam for this purpose, and on the prior appeals it was held that this agreement must be considered in computing the damages suffered by respondents by reason of the diversion. It was mainly for the reason that the trial court on the prior trials failed to give any consideration to this agreement that this court reversed the judgments. The prior appeals have definitely established as the law of these cases that Pitville Pool is, in effect, a lake or reservoir with two sources of supply—Pit and Fall Rivers—and with one outlet—Pit River below the rock reef.

The record shows that in the summer months the flow of Pit River at Young's Falls is erratic and very small, dropping on occasions to 1.8 second feet, while the flow of Fall River in those months is dependable and large, seldom dropping below 1,000 second-feet, and averaging around 1200 second-feet. It is admitted that the waters of Fall River are clear, cold, and pure, while the waters of Pit River are dark, murky, and warm. In the winter months Pit River flows in such quantities and with such velocity into the pool, that no

substantial quantity .of Fall River water (before the diversion) remained in the pool—it being forced out over the rock reef by the Pit River water. In the summer months, however, the former appeals have determined that Fall River water in a state of nature flowed into the pool and mingled indiscriminately therein with the Pit River water to form the *corpus* of the water in the pool. For that reason, it was held on the prior appeals, and this holding has become the law of these cases, that respondents' lands are riparian to Fall River in the summer months, as well as riparian to Pit River. These actions are for damages for the alleged injury to these riparian rights, the theory of respondents being that the deprivation of Fall River water in the summer months, caused by the diversion, has resulted in diminution in the market value of their riparian properties in two ways, (1) That the quantity of water in the pool has been reduced below respondents' actual and prospective reasonable and beneficial needs; and (2) That the pool has been deprived of the freshening effect of the Fall River water, as a result of which the pool has become stagnant and polluted.

On these appeals appellant makes many objections to the judgments. ■ One of appellant's main contentions, stated in various ways, is that its use of the waters of Fall River is in the exercise of its riparian rights, and that its use of the entire flow of the stream for power purposes, under the facts, constitutes a proper, reasonable, and beneficial use of the waters of the stream. Based on this major premise, appellant urges that no damages should have been awarded respondents; that respondents' proper and only remedy is an action to apportion; that the trial court should have ascertained the relative riparian rights of the appellant and respondents in and to the waters of Fall River as prayed for in its amended answer filed at the beginning of the present trials; that certain instructions dealing with this subject should not have been given, and others offered by appellant should have been given, and that certain statements dealing with this issue appearing in the hypothetical question submitted to respondents' valuation witnesses were based on an erroneous theory. Predicated on the same basic premise, it is also urged that even if the diversion has resulted in polluting the pool, such pollution is not actionable, being the result of the exercise by appellant of its riparian rights. This last-

stated contention will be discussed later in this opinion. The basic premise upon which all of these contentions are based is unsound, and for that reason all of them are without merit. These identical contentions, in varying forms, have been made on each of the prior appeals. If appellant's basic premise were sound, it would inevitably lead to the conclusion that regardless of damages suffered no action would lie therefor. Such a conclusion would clearly be contrary to the law of these cases established on the prior appeals. The prior appeals have unequivocally determined that if the market value of respondents' properties was depreciated by reason of the diversion, they are entitled to damages, and that apportionment is not the proper remedy. On each of the prior appeals this court and the District Court of Appeal held that if the evidence supports respondents' claims of damage, respondents are entitled to recover therefor even though appellant's use of the water may be in the claimed exercise of its riparian rights. In the Anna McArthur appeal (3 Cal. (2d) 704, 712) in discussing this identical contention, this court stated:

" . . . this question was before the appellate and this court in the first and second appeals in the Crum and Albaugh cases. The contention of appellant as to the nature of respondent's remedy finds support in none of the decisions rendered by either of said courts in the Crum and Albaugh cases. On the contrary, the decisions, both of the District Court on the first appeal and of this court on the second appeal, held that respondents' remedy was one in damages and not for apportionment.'' In the Crum and Albaugh decision on the second appeal this court stated (220 Cal. 295, 298) : ''The opinions of the District Courts of Appeal in these cases have clearly established the law of the case to be that plaintiffs are entitled to damages. To the discussion contained in our former opinion on this point, we add the following observation: Assuming, but not deciding, that defendant's use of the water is in the exercise of its riparian rights, but constitutes an excessive use of the waters of Fall River, plaintiffs could not, as contended by defendant, secure an apportionment of said waters. This is so for the reason that a public use has attached to the entire flow of Fall River.'' This identical language was quoted with approval in the Anna McArthur case (3 Cal. (2d) 704, 713). After quoting the pertinent language in the various Crum and Albaugh appeals

dealing with this issue, this court in the Anna McArthur appeal concluded as follows (3 Cal. (2d) 704, 714):

"There can be but one conclusion drawn from the foregoing facts and the law as applied to said facts in the two Crum and Albaugh appeals — and that conclusion is that the respondent's remedy in this action is not an action for the apportionment of said waters, but one in damages suffered by respondent by reason of appellant's diversion of the waters of Fall River."

In the order of reversal in the Crum and Albaugh cases (220 Cal. 295, 314) it is stated: "For the foregoing reasons the judgments appealed from are and each of them is hereby reversed and the cases remanded for a new trial on the issue of damages alone and in accordance with the views herein expressed." Substantially the same order was made in the three McArthur cases (3 Cal. (2d) 704, 721, 765, 766). In the main opinion on the McArthur appeals, in addition it was stated (3 Cal. (2d) 704, 721): "As we view the case, all the issues have been determined, except the one issue of damages, and in the event of a retrial, the court will be limited to the determination of this one issue."

A reading of the various prior opinions in these cases clearly establishes that in all of them it has been held that when a riparian owner diverts the entire flow of a stream away from another riparian to the latter's damage, and the entire flow has been devoted to a public use, the riparian owner who suffers damage has neither an action for an injunction nor for apportionment, but his sole and proper remedy is for damages. The prior opinions clearly establish that this conclusion follows whether or not the diverting riparian's use purports to be in the exercise of his riparian rights. These prior opinions clearly establish that if respondents have suffered material damage by reason of the diversion, the use by appellant must be held to be an excessive use, and since a public use has attached to the entire flow, respondents' remedy is for money damages.

It is obvious that if the diversion of Fall River by appellant has injured respondents by causing a depreciation in the market value of their riparian lands, that injury could be caused either by loss of the quantity of water necessary for their reasonable beneficial needs, actual or prospective, or by

injury to the quality of the water in the pool. These two items of damage will be separately considered.

First, as to loss of quantity. It is clear that in these actions respondents must recover for their entire damage, inasmuch as the full flow of the Fall River has been devoted to a public use. It must therefore be determined not only whether the evidence discloses that there has been sufficient water in the pool since the diversion to meet all the immediate needs of respondents, but also whether there is a sufficient quantity to meet reasonable, beneficial and prospective needs. On the prior appeals, it was assumed that the construction of the dam at the rock reef would maintain the old level of the pool, and the causes were reversed by this court because the juries on those trials were not permitted to give any consideration to appellant's offer to permanently maintain the dam at the rock reef. On the present trial that offer was taken into consideration. The respondents frankly admit that since the construction of the dam in 1923 the pool has been maintained at its former level, and that since that time there has been sufficient water in the pool for all irrigation purposes for which respondents have desired to use the water. This concession is clearly in accord with the uncontradicted evidence. The evidence also shows, however, that since 1923 the riparians on the pool have pumped very little water therefrom. Respondents point out that the flow of Pit River at Young's Falls, the inlet to the pool, in the summer months, on occasion, falls to as low as 1.8 second-feet, and averages around 8 or 10 second-feet, and contend that such a small flow is not sufficient for the reasonable, beneficial, and prospective needs of the riparian owners of the pool. They point out that since the diversion the major source of supply to the pool has not been Pit River, but the McArthur canal and the Knoch pipe line, and these waters, they contend, cannot be considered a legal or dependable source of supply for the reason that these waters are waste waters which may be taken away at any time. Appellant, on this issue of quantity of water available, points to the uncontradicted evidence that since the diversion the flow at the rock reef, the outlet of the pool, has averaged 60 second-feet. It is admitted that a 60 second-foot continuous flow would be more than sufficient for all the irrigation needs, actual and prospective, of all the riparians on the pool. On this same issue appellant also urges that it is the law of

these cases, as established on the prior appeals, that as to quantity of water respondents have suffered no damage. This last contention will be considered first.

■ On the prior appeals several of the opinions mentioned the fact that the evidence demonstrated that since the construction of the dam the level of the water in the pool has remained as it was before the diversion, and it was assumed in those opinions that the dam would continue to maintain the level of the pool, so that respondents would have available to them the same quantity of water as existed before the diversion. A reading of those opinions, however, clearly demonstrates that in none of them was the merits of the dam to maintain the pool passed upon. This clearly appears in the Anna McArthur opinion (3 Cal. (2d) 704, 720), where in interpreting the prior cases this court stated:

"It is further evident from what we have said that neither at the second trial of the Crum and Albaugh cases, nor at the trial of this case, were the merits of the dam erected by the appellant at the rock reef in Fall River determined by the court. In fact, the presence of the dam was to all intents and purposes ignored by the trial court at the trial of each of the cases. It has been assumed that its construction and maintenance in the manner heretofore described would maintain the level of Pitville Pool at its original height, but that fact has never been definitely determined by the court. . . . We do not wish to be understood as foreclosing the parties hereto, in case of a further trial of this action, from litigating the effectiveness of said dam and operating gates, erected at said rock reef, to maintain the level of the water in Pitville Pool at its original height, without discharging therein a portion of the water of Fall River."

An examination of the prior appeals also demonstrates that it was assumed therein that the water impounded in the pool by the dam was largely Pit River water. In none of the prior cases was any attempt made to determine the exact source of the waters in the pool since the diversion. For the foregoing reasons it must be held that the point here involved has not been passed upon nor determined by the prior appeals.

■ Turning now to the question as to what the evidence shows as to the quantity of water available to and the needs of respondents, we are of the opinion that the evidence in

these cases amply supports the implied findings of the juries that as to quantity of water respondents have suffered material damage by reason of the diversion resulting in a material depreciation in the market values of their riparian properties. Before the diversion, in the summer months, respondents' lands were riparian to both the Fall and the Pit Rivers. Fall River, the records show, had a constant flow where it emptied into the pool, in the summer months, of from 1,000 to 1800 cubic feet per second, and averaging around 1200 cubic feet per second. This was an entirely dependable source of supply. Of course, if Pit River furnished an equally dependable source of supply sufficient to supply all riparians on the pool with water for all of their actual and prospective reasonable and beneficial needs, then the taking of the Fall River water by appellant, under the new water doctrine of conservation in this state, would impose no legal liability on it. In that event, even if appellant were an appropriator (and appellant is a riparian) it could lawfully divert all water not reasonably necessary for the actual or prospective beneficial needs of respondents. (*Gin S. Chow* v. *City of Santa Barbara*, 217 Cal. 673 [22 Pac. (2d) 5] ; *Peabody* v. *City of Vallejo*, 2 Cal. (2d) 351 [40 Pac. (2d) 486] ; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.*, 3 Cal. (2d) 489 [45 Pac. (2d) 972].) But the evidence does not show that Pit River, in the summer months, furnishes sufficient water to meet the reasonable, beneficial needs, actual and prospective, of all riparians on the pool. The evidence shows quite the contrary. It is to be noted that in determining the needs of respondents consideration must be given not only to their present needs, but also to their prospective needs, for the reason that a public use has attached to the full flow of Fall River. It follows, as already pointed out, that for that reason, in these actions, respondents must recover for all damages suffered, both actual and prospective. That deprivation of water for reasonable, beneficial, prospective needs is actionable under the new water doctrine in this state has now been settled. (*Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.*, *supra*, 531.)

The evidence does disclose, as contended by appellant, that, at least since 1928, at all times there has flowed over the dam at the rock reef, the outlet of the pool, a quantity of water never falling below 46 cubic feet per second, and that the mean monthly flow at that point has been in excess of 60

cubic feet per second. If that quantity represented the true quantity of water flowing into the pool and legally available to respondents, then all of their arguments as to loss of quantity of water would be without merit. But the undisputed evidence shows—in fact one of appellant's own exhibits demonstrates (defendant's exhibit R)—that at Pitville, the place where the Pit River flows into the pool, the estimated flow in May of 1934 dropped to 1.8 cubic feet per second— hardly enough to take care of the evaporation losses in the pool. The same exhibit shows that in the summer months the mean monthly flow into the pool at that point has frequently been five cubic feet per second or less, and averages around eight or ten second-feet. It was stipulated on these trials that there are 3,068.21 acres of land riparian to the pool, all entitled to water therefrom. Obviously, the flow into the pool from Pit River is not sufficient to irrigate that quantity of land, particularly as the evidence shows that nearly all of the riparian land is best suited for the growing of alfalfa and other crops requiring large quantities of water for irrigation, and that without irrigation the lands are worth but $15 to $20 per acre.

The explanation of the difference between the inflow and outflow of the pool is found in the fact that respondents Luther and Roderick McArthur for many years have permitted waste water from the McArthur canal to flow into the pool, and that appreciable quantities of water have also drained into the pool from the Knoch irrigation system. The controversy between the parties to these appeals over the quantity of water in the pool largely turns upon whether the water from said two sources should be considered in estimating the dependable water supply available to respondents.

Based on its major contention that the water from the McArthur canal must be considered as one of the dependable sources of supply for the pool, appellant predicates many arguments, all of which are unavailing if the major premise is unsound. Appellant contends that the flow from the canal must be considered in determining the available supply for all respondents; that instructions given to the jury to the contrary constituted reversible error; that the hypothetical question submitted to respondents' valuation witnesses ignored this source of supply, and therefore their opinions as to depreciation were based on an incorrect question; and that the damages as to Luther and Roderick McArthur must be

reduced because of the existence of this available source of supply. All of these contentions, in our opinion, must fail for the reason that the waters from the McArthur canal and the Knoch pipe line are waste waters and cannot be considered as a dependable or legal source of supply upon which respondents are entitled to rely.

The McArthur canal was constructed over thirty years ago by the predecessors in interest of the respondents McArthur for the purpose of draining certain swamp lands. For many years, the McArthurs have diverted through this canal a definite quantity of water from the Tule River, a tributary of the Fall River. The water is conveyed through the canal to the lands of Luther and Roderick McArthur. At the present time, and for many years past, this Tule River water is and has been used by Roderick McArthur partially for power purposes and partially for irrigation purposes. The portion of the water used by Roderick McArthur for irrigation is used by him in irrigating portions of his lands riparian to the pool. A considerable quantity flows into the pool directly from the canal, and some water drains into the pool from such irrigation. The Luther McArthur water from this canal is piped across the pool and run into a ditch and is used for irrigating his lands riparian to the pool. Until 1924 the flow into this canal was quite large, but in that year appellant herein brought an action against the McArthurs to restrict them in the amount of their diversions. The judgment entered in that action established in Roderick and Luther McArthur a right by prescription to divert through the canal some 67 cubic feet of water in the manner and fashion as set forth in the decree. Both sides appealed, and on such appeals, the decree was affirmed (*Mt. Shasta Power Corp.* v. *McArthur*, 109 Cal. App. 171 [292 Pac. 549]). The evidence reviewed by the appellate court in the opinion clearly establishes that the McArthur's right to this water is predicated entirely on prescription. The uncontradicted evidence introduced on the present trials shows that Roderick and Luther McArthur, either individually or jointly, own 3,500 acres of land not riparian to the Fall, Pit or Tule Rivers, adjacent to the McArthur canal and capable of being irrigated therefrom. The evidence likewise shows that those lands are suitable for raising crops requiring irrigation. At the present time the McArthurs have elected to use the waters from the canal for irrigating their lands

riparian to Pitville Pool, but they lawfully may change the place of use at any time. Thus they lawfully could elect at any time to irrigate their nonriparian lands, in which event not one drop of water from the canal would drain into the pool.

■ Appellant argues at great length that the McArthurs' use of the canal water must be held to be in the exercise of their riparian rights. This argument is predicated on the theory that the Tule River is a tributary of the Fall River, and the place of use is on lands riparian to the Fall River in the summer months. It is contended that the case is simply one where a riparian in the exercise of his riparian rights diverts water above his riparian lands for use thereon. If such were the facts the water would have to be used on the riparian lands, and all waters not so used would have to be returned to the pool. The argument is without merit. It has been adjudicated between the McArthurs and appellant that the McArthurs' use of the canal water is based on adverse use for the statutory period. It has definitely and positively been determined that the right is a prescriptive and not a riparian right (*Mt. Shasta Power Corp.* v. *McArthur, supra*). That determination is *res judicata* as between Roderick and Luther McArthur and appellant, and *stare decisis* as between appellant and the other respondents. The contention that the above-cited case was decided under the belief that the McArthurs' Pitville Pool lands were in a different watershed from the Tule River and were not riparian thereto, even if correct, would avail appellant nothing. If it be assumed that the McArthur Pitville Pool lands are riparian to the Tule River, that would not determine that the diversion of the water by means of the canal was in the exercise of their riparian rights. It is obvious that under a proper state of facts even a riparian may gain a right by prescription to the use of the waters of a stream. The evidence reviewed by the appellate court in 109 Cal. App. 171 clearly indicates that the holding therein that the water right involved was based on prescription is the only reasonable holding that could have been made, and this is so whether or not the lands of the McArthurs on Pitville Pool be considered to be riparian to Tule River.

■ The right being a prescriptive one, it is a usufructuary right, not a part or parcel of any particular land. As long as the beneficial use is continued, the owners of the pre-

scriptive right may change their place or character of use, provided vested rights are not injured thereby (*San Bernardino* v. *Riverside,* 186 Cal. 7, 28 [198 Pac. 784]). The cases of *Southern Cal. Inv. Co.* v. *Wilshire,* 144 Cal. 68 [77 Pac. 767], and *Scott* v. *Fruit Growers Supply Co.,* 202 Cal. 47 [258 Pac. 1095], relied upon by appellant merely state the settled rule that an appropriator may not change his place of use if such change would be injurious to others. No vested or other rights would be injured if the McArthurs should decide to change their place of use. The waste water draining or running into the pool has not as yet been put to a beneficial use by others. It follows, therefore, that the legal right to change the place of use exists. From what has been said it follows that in computing the quantity of water legally available to the respondents from the pool, including Roderick and Luther McArthur, the quantity of water draining or running therein from the canal should not and cannot be considered.

The same legal situation exists as to the Knoch water. Apparently by agreement with appellant, the appellant permits a certain defined quantity of water to flow down the old channel of the Fall River to where it is piped across the pool and used by the Knochs to irrigate their lands riparian to the pool. From such irrigation there is drainage into the pool. The Knoch supply is obviously an artificial one and may be taken away by Knoch at any time.

The only other source of supply to the pool is Beaver Creek, which furnishes a small supply, not to exceed 2 to 4 second-feet, and on occasions it is entirely dry. The evidence shows that evaporation losses in the pool average over two second-feet.

It should also be mentioned that upstream from the pool the riparian use of Pit River water is increasing, so that, in the course of time, even the small flow of that river will be decreased below its present flow. The evidence discloses that on Looseley Pool, just upstream from Pitville Pool, there is not at present, and for some time past has not been, sufficient water flowing in Pit River to fill the needs of riparians on that pool or to warrant the improvement of the riparian lands there located.

As already indicated, the parties stipulated that there are 3,068.21 acres of land riparian to the pool which are entitled to water therefrom. All but a small portion of that

acreage is suitable for growing alfalfa and other crops requiring irrigation. Obviously a mean flow of around 10 second-feet—a flow which is sometimes reduced to below 2 second-feet—is not sufficient to meet all the irrigation needs, actual and prospective, of that acreage. Appellant points out that of the 3,068.21 acres, some 1300 acres are already irrigated from various sources, and should be excluded from consideration in determining the needs of the riparians on the pool. The Knoch lands are irrigated from the Knoch pipe line—a source of supply that may be discontinued at any time. Knoch has an equal right with the other riparians on the pool to his correlative share of the water. Nearly 475 acres riparian to the pool are now being irrigated by Roderick and Luther McArthur from the canal, a use they are not legally bound to continue. These two respondents, for reasons already mentioned, are entitled to their correlative share of the water in the pool to irrigate their riparian lands. Albaugh irrigates a portion of his lands through the Wendt-Albaugh ditch, a gravity ditch leading from Looseley Pool. As already indicated, the supply therefrom is uncertain and not sufficient for all riparian needs. He has the legal right to draw from the Pitville Pool at any time. All of these areas were properly taken into consideration in ascertaining the areas entitled to irrigation from the pool.

▆▆ Appellant also objects to the hypothetical question submitted to respondents' valuation witnesses, it being appellant's contention that the question erroneously told the witness that there "are approximately 3,000 acres of riparian land adjacent to the pool". The sentence is, of course, in accord with the stipulation, but appellant contends that the question was intended to convey to the witnesses the impression that approximately 3,000 acres were susceptible of irrigation from the pool, which appellant contends is not the fact. Appellant refers to some relatively small areas devoted to roads and buildings, and contends those areas are entitled to no water, and also refers to certain testimony indicating that certain portions of the riparian land are incapable of irrigation. A reading of the record convinces us that even if the question be interpreted as contended by appellant, it finds support in the evidence introduced by respondents. Civil engineer Man testified that within a hundred foot elevation from the pool there were about 3,000 acres—all agricultural land. He testified in detail as to the acreage of

768

each respondent under various lifts. Roderick McArthur testified that of the 3,068.21 acres riparian to the pool all except a very small acreage was adapted for the growing of alfalfa. Respondents' witness Godfrey Inabnit, engineer and manager of the Grenada Irrigation District in an adjoining county, testified he had made a thorough investigation of respondents' lands to determine whether it was economically feasible to irrigate such lands by pumping from the pool. He testified that in his district, in territory substantially similar to that surrounding Pitville Pool, water is regularly pumped with a 122-foot lift for irrigation purposes. He testified that nearly all of respondents' lands were suitable for the growing of alfalfa, and that this was particularly true of the higher bench land. He testified in detail as to the areas susceptible of irrigation from the pool at various lifts. All but a small portion of respondents' lands could be irrigated with a maximum lift of not over 100 feet. He testified that water could be pumped up to 150 feet from the pool, and that such a lift was economically feasible. All of the 3,068.21 acres riparian to the pool are under this 150-foot elevation.

It is true that there was conflicting evidence as to the riparian area economically susceptible of irrigation, but this court cannot, of course, weigh conflicting evidence. In view of what is to be found in the record, we must hold that there is substantially credible evidence to support the view that there are substantially 3,000 acres of land riparian to the pool which it is economically feasible to irrigate therefrom, and which are of such a character as to require irrigation. Inabnit testified that three acre feet of water per acre per season would produce three good crops of alfalfa. Other testimony showed that five to six crops per year could be produced on the land if properly irrigated. This would require more water than Inabnit's minimum of three acre feet. Even to supply the minimum requirements of all riparians on the pool would require a continuous flow of between 25 to 30 second-feet into the pool, and that is assuming the most perfect economic use with perfect rotation of use. Such estimate gives no consideration to evaporation or conveyance losses.

In view of the foregoing it is obvious that the evidence supports respondents' contention that they have suffered material damage by loss of the quantity of water in the pool.

■ We turn now to a discussion of depreciation in the market value of respondents' lands predicated on the theory that the diversion has resulted in pollution of the pool. The major contention of appellant in this regard is that there could be no pollution resulting from the diversion without evidence of an upstream flow of Fall River in the pool prior to the diversion, and that the evidence establishes a downstream flow in the pool. This argument based on the theory that there was a downstream flow in the pool is inconsistent with at least one other argument of appellant. If there is now and always has been a downstream flow in the pool, then part of Roderick and Luther McArthurs' lands, all of tract 2 of Anna McArthur, and all of the Crum and Albaugh lands could not be in any way affected by the flows from the McArthur canal and the Knoch pipe line—these lands all being "upstream" from those sources of supply. However, the complete answer to this contention is that although appellant introduced evidence of a downstream flow, all of the prior decisions definitely determined the pool was a lake or reservoir, which, before the diversion, had two major sources of supply, Fall and Pit Rivers, and one outlet—Pit River below the rock reef. In this lake or reservoir the waters of the two streams mingled indiscriminately to form the *corpus* of the waters in the pool. In the *Crum and Albaugh* v. *Mt. Shasta Power Corp.* appeal to this court, it was stated (220 Cal. 295, 300):

"We agree with plaintiffs that the evidence introduced on this trial, as well as the law of the case, as established on the prior appeals, fully establishes that Pitville Pool is a natural reservoir, which is filled with water in the summer months from both the Pit and Fall Rivers, and that in those months plaintiffs' lands are riparian to both streams. We are of the opinion that the evidence establishes that Fall River, in the summer months, in a state of nature, contributed a large quantity of water to this pool, which water mingled with and became an inseparable part of the *corpus* of the water in the pool. In other words, Pitville Pool is a miniature lake in the summer months, its waters in that period consisting of Pit and Fall River waters mingled indiscriminately."

A similar holding was made by the appellate court on the Crum appeal, where it was also held that the presence of a current in the pool was an immaterial factor—that the evidence showed the two streams mingled indiscriminately (117

Cal. App. 586, 596). In the Anna McArthur case (3 Cal. (2d) 704, 710) this court quoted with approval and adopted the language of the appellate court and of this court, above referred to. In view of these holdings, which have become the law of these cases, it is now too late for appellant to successfully urge that the evidence demonstrates a downstream flow. There is nothing in the evidence on the present trials to cause us to retract from our former holding. Contrary to appellant's contention it was not necessary on the issue of pollution or on any other issue here presented for respondents to prove an "upstream" flow of Fall River; it was sufficient to show that the two streams mingled indiscriminately in the pool. This must now be taken as thoroughly established by the prior appeals. As a matter of fact if appellant is correct, that the pool always had a downstream flow, that would demonstrate that respondents' lands are not riparian to Fall River at all, and that contention has admittedly been thoroughly and completely refuted on each of the prior appeals. It has been the theory of respondents on all of the trials of these cases, including the instant ones, that Fall River, by flowing into the pool and mingling with the Pit River water, freshened the waters in the pool; that the freshening influence was lost by the diversion; that by reason thereof the waters now in the pool have been rendered stagnant, and the pool has been covered with weeds, slime and moss, and a foul odor emanates from the pool, and that on occasions cattle have refused to drink therefrom. Substantially the same evidence was introduced by respondents on the present trial on this issue as was presented by them on the prior trials. Concerning this evidence this court in *Crum* v. *Mt. Shasta Power Corp.*, 220 Cal. 295, 312 [30 Pac. (2d) 30], after pointing out that a riparian owner, even as against another riparian, is entitled to a substantially unpolluted stream stated:

"We are of the opinion that the evidence in the present case offered on behalf of plaintiffs clearly shows that the quality of the water in Pitville pool has been materially impaired by the diversion and by the construction of the dam. The evidence shows without conflict, that the waters of Fall River have always been clear and pure, while the waters of Pit River have always been dark and murky. The evidence likewise shows that before the diversion the waters of Fall River rushed down into Pitville pool with a minimum flow

of 1,000 second-feet. The Fall River waters, as we have already held, mingled with the dark murky waters of Pit River to form the pool. The jury could have reasonably inferred that the Fall River waters freshened the water in the pool. Since the diversion the freshening effect of the Fall River waters has been lost. Moreover, by the construction of the dam, obviously the flow of water through the crevice in the rock reef has been stopped,. resulting in the Pit River water backing up. There was ample evidence introduced on behalf of plaintiffs to show that since the diversion the waters of Pitville pool have become stagnant; that the pool in the summer months is now covered with weeds, slime, and moss; and that a very obnoxious odor now emanates from the pool, which is obnoxious to the senses for a distance of one-half mile from the water. There is also some evidence that since the. diversion cattle will not drink the polluted water. There is ample evidence from which the jury could have found that these conditions did not exist before the diversion, and from which the jury could have inferred that the changed conditions were caused by the diversion and by the construction of the dam. It hardly need be added that if such changed conditions resulted in a material impairment of the value of plaintiffs' lands, plaintiffs may recover therefor.''

On the Anna McArthur appeal (3 Cal. (2d) 704, 719) this court quoted with approval the above language from the Crum appeal and then concluded: ''The foregoing statement correctly expresses our views respecting the issues now before us, and which are precisely like those determined by us in our former opinion from which said statement was taken.''

It is true that appellant introduced more evidence and new theories on the present trials on the issue of pollution than had been presented by it on the prior trials. Two chemists were produced who testified that from a chemical analysis the water in the pool was fit to drink. Scores of photographs showing horses and cattle apparently drinking from the pool after the diversion were introduced. This, and the other evidence introduced by appellant on this issue, did nothing more than create a conflict in the evidence, which was resolved by the jury contrary to appellant's contentions. There can be no doubt—in fact, appellant admits—that the evidence thoroughly establishes that since the diversion there has been a marked increase in the weed growth in the pool, and that since the diversion in many years in the summer months

the pool has been covered with weeds, slime, and moss. Appellant contends, however, that these conditions were due not to the diversion but to many years of subnormal run-off of Pit River. This argument is necessarily predicated on appellant's contention, already refuted, that before the diversion the Fall River water did not mingle with the Pit River water in the pool. The argument totally ignores the permissible inference that the Fall River water freshened the pool. Considerable credible evidence was introduced that since the diversion a foul odor has emanated from the pool. Various witnesses for respondents testified as to the preference of cattle and horses for other fresh and nonstagnant water. Several witnesses living on the pool testified that in the years since the diversion they have never seen cattle drink from the pool. As already held on the prior appeals, the juries were amply justified in inferring that these conditions were caused by the diversion and the construction of the dam, and that such changed conditions caused a material depreciation in the market value of respondents' lands. No useful purpose would be served in further recounting the evidence on these points; the record presents nothing more than the usual conflict.

Only one other point in reference to pollution need be here discussed. Appellant contends that even if the pool was polluted by the diversion, such damage is not actionable for the reason that one riparian owner cannot maintain an action for damages against another based on pollution when the first riparian is making a proper riparian use of the waters of the stream. The juries were here correctly instructed that plaintiffs were entitled to have the waters come to them undefiled and unpolluted, unless such pollution "results from a reasonable enjoyment by the defendant of its rights as a riparian owner". The complete answer to this contention is that appellant has devoted the entire flow of Fall River to a public use, which use, under the evidence already reviewed, and under the law of these cases as established on the prior appeals, must be held to be an excessive use. (See *Crum* v. *Mt. Shasta Power Corp.*, 220 Cal. 295, 312 [30 Pac. (2d) 30]; *McArthur* v. *Mt. Shasta Power Corp.*, 3 Cal. (2d) 704, 718 [45 Pac. (2d) 807].) The point is without merit.

From what has already been said, it follows that the implied findings of the juries that respondents have suffered material damage by reason of the diversion, both by loss of

quantity and impairment of the quality of the water, must be held to be sustained. All of appellant's contentions on these issues, whether based on the evidence, the hypothetical question, or the instructions, are without merit.

■■■ The last major contention of appellant is that the verdicts are not supported by the evidence, and are excessive as a matter of law. Before directly discussing this subject, it should be pointed out that appellant on this point, as well as on several of the other points already discussed, has disregarded the rules of law applicable to appellate procedure. Appellant by argument based on its view of the evidence, by disregarding conflicting evidence and by the contention that certain adverse evidence has been "completely destroyed", in its briefs makes a quite convincing showing on this issue. Of course, the jury is the sole judge of the effect, sufficiency, and weight of the evidence, and the sole judge of the credibility of the witnesses. Whatever our opinion may be as to the weight of the evidence, if there is material, credible evidence to support the verdicts, this court is without power to disturb them. As was said in *Crawford* v. *Southern Pac. Co.*, 3 Cal. (2d) 427, 429 [45 Pac. 183] : "In reviewing the evidence on such an appeal all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked, principle of law that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury." These principles are elementary. (See *Lindemann* v. *San Joaquin Cotton Oil Co.*, 5 Cal. (2d) 480, 503 [55 Pac. (2d) 870] ; *Dunphy* v. *Dunphy*, 161 Cal. 380, 384 [119 Pac. 512, Ann. Cas. 1913B, 1230, 38 L. R. A. (N. S.) 818] ; *Robinson* v. *Robinson*, 159 Cal. 203, 204 [113 Pac. 155].) Although the verdicts herein are undoubtedly large, and although we have no hesitancy in stating that they are larger than we would have rendered had we been the trier of the facts, in reviewing the evidence, we are bound by the above rules.

Keeping these principles in mind, we turn to a discussion of the evidence here produced by respondents as to the amount of damages suffered by them. As already stated, these cases have been tried several times. The following

table lists the verdicts rendered in these cases on these and on the prior trials:

| Plaintiff | First Appeal | Second Appeal | Present Appeal |
|---|---|---|---|
| Crum | $20,000 | $32,100 | $22,275 |
| Albaugh | 65,000 | 96,300 | 65,000 |
| Anna McArthur | 32,500 | ....... | 20,771 |
| Luther McArthur | 71,630 | ....... | 91,121 |
| Roderick McArthur | 37,500 | ....... | 56,388 |

The measure of damages here involved is, of course, the depreciation in the market value of respondents' lands caused by the diversion. The following table shows this depreciation per acre as fixed by the juries on the present trials:

| Plaintiff | Acreage | Average Award Per Acre |
|---|---|---|
| Crum | 116 | $192 |
| Albaugh | 410 | 159 |
| Anna McArthur | 266 | 73 |
| Luther McArthur | 573 | 159 |
| Roderick McArthur | 330 | 170 |

Respondents' witnesses testified in detail as to the character of the soil on respondents' properties. These witnesses testified that practically the entire acreage was ideally suited for the growing of alfalfa, and that properly irrigated, such lands should produce from five to six tons of alfalfa per acre per season. These witnesses testified that such lands, if assured of a dependable and sufficient water supply such as existed before the diversion would be worth from about $250 to $400 or more per acre. They likewise testified that although there was at present sufficient water in the pool, that it was such an unreliable supply that it would not warrant the riparians in making extensive improvements on their properties. These witnesses pointed out that if all entitled thereto began to draw on the pool, and if the pool were deprived of the McArthur canal and Knoch pipe line water, there would be a grave deficiency, and it was their opinion that a prospective purchaser, in considering the market value of the lands, would be forced to consider them as practically dry lands without a dependable supply of water, worth but from $15 to $20 per acre. This conclusion is sound. With the Pit River constituting the only dependable source of supply, with the flow of that stream into the pool falling as low as 1.8 second-feet, with increased riparian use of Pit River upstream, with there being an insufficient supply

of water in the Pit River at Looseley Pool, upstream from Pitville Pool, for riparian requirements there, no purchaser would purchase respondents' lands for the purpose of growing alfalfa or any other crop requiring substantial irrigation.

The respondents called five valuation witnesses to testify as to depreciation in the McArthur cases and four such witnesses in the Crum and Albaugh cases. The following table graphically summarizes their testimony, showing the depreciation in value caused by the diversion as testified to by each of these witnesses:

Depreciation in value

| Witness | L. Mc-Arthur | Rod. Mc-Arthur | A. Mc-Arthur | Crum | Albaugh |
|---|---|---|---|---|---|
| Looseley | $180,000 | $125,000 | $76,352 | $36,540 | $100,000 |
| Joerger | 192,500 | 130,000 | 72,235 | . . . . . . | . . . . . . . . |
| Haynes | 146,000 | 84,000 | 51,910 | 17,500 | 67,000 |
| Anders | 146,000 | 84,000 | 51,910 | 31,900 | 102,500 |
| Opdyke | 156,000 | 115,000 | 64,000 | 36,888 | 103,000 |
| Amount of Judgment | $ 91,121 | $ 56,388 | $20,771 | $22,275 | $ 65,000 |

As the above table indicates the verdicts are all well within the estimates of the expert witnesses. With the sole exception of the witness Haynes as to depreciation of the Crum lands, all of the experts testified as to far larger depreciations in value than the verdicts under review. These witnesses were all well qualified to testify as to land values in that area. They were thoroughly familiar with land values throughout the Fall River valley, and particularly with land values around or near Pitville Pool. They showed detailed knowledge of all sales of land within recent years about or near the pool. It is true that appellant on cross-examination asked the witnesses if they knew of various particular sales of farm lands in Pit and Fall River valleys where the sale price was between $36 to $100 per acre, and the witnesses admitted they did. Several of the witnesses pointed out that the Fall River valley properties involved in such sales were not comparable with respondents' properties, being much inferior in value. It is also true that included within the sales called to the attention of the valuation witnesses, were several sales of Pit River properties, including several purchases by respondents of some of the properties here involved, and that the top sale asked about by appellant was the purchase by Crum of his

property in 1920 for about $100 per acre. The witnesses knew of these sales but testified that these lands had been secured at bargain prices or on forced sales. The witnesses showed themselves as being thoroughly familiar with the background of those sales. On redirect examination these witnesses testified that they knew of other farm land sales in Pit and Fall River valleys of properties comparable with those of respondents, and that the prices secured for such lands were comparable with or higher than the values they had placed on respondents' lands. It cannot be held that the testimony of these witnesses is incredible or that it has been entirely destroyed. We must hold that such evidence is sufficient to support the verdicts. It is worthy of passing mention that on the present trials of the Crum and Albaugh cases appellant introduced no evidence at all of the market values of these two respondents' properties, although such evidence had been introduced on prior trials.

Appellant makes a strenuous assault upon the valuations placed on the properties of Luther and Roderick McArthur for the reason that a large portion of their lands riparian to the pool are now being irrigated from the McArthur canal. It is contended that these lands are not "dry" lands. The answer to this contention has already been given. These two respondents own 3,500 acres of nonriparian land adjacent to the canal on which this prescriptive water could be used. In computing their damage it was not error to exclude this source of supply. A similar assault is made on the award in favor of Albaugh, and must fail for reasons already given. It is true that Albaugh irrigates a portion of his riparian lands from the Wendt-Albaugh ditch which has its source in Looseley Pool. That supply is uncertain and insufficient, and not to be compared with the copious, pure, and dependable supply of which Albaugh has been deprived.

Another factor to which consideration must be given is that three successive juries have rendered substantial verdicts in the Crum and Albaugh cases, and two successive juries have done likewise in the McArthur cases. After each trial the trial judge denied motions for new trials. These factors are entitled to some weight on the issue as to whether the verdicts are excessive, and are of considerable weight in passing on the question as to whether the verdicts now under review were rendered under the influence of passion or prejudice.

In *Grant* v. *Los Angeles Transfer Co.*, 45 Cal. App. 731, 732 [188 Pac. 294], the court, in reference to a somewhat similar situation, stated: "Suffice it to say that we have presented to us here the fact that three juries and trial judges have passed upon the case at different times, and that each and all of them have concluded that ten thousand dollars was not too great a verdict to be awarded herein. Under this state of the record (coupled with other facts not involved on the instant appeals) . . . we think it would require an exceedingly strong case to move an appellate court to set aside the verdict for the reasons urged. It would be going far afield, in our opinion, in the face of these facts, to assume *as a matter of law,* that all these—the three juries and two judges—were moved to reach their conclusions 'under the influence of passion or prejudice'. No such case is here presented.''

The principles above enunciated have frequently been approved by many jurisdictions. Amply supported by many citations, the principles are thus stated in 4 Corpus Juris, page 867, section 2844: "As a general rule, after two or more successive and concurrent verdicts, the appellate court will be strongly disinclined to interfere with the last verdict, and the findings under such circumstances are usually accepted as final, especially where the trial court approved all of the verdicts or the last verdict, or where at the last trial the case of the prevailing party was strengthened by additional and substantial evidence. 'To take this course', it has been said, 'is not to weakly permit or approve the doing of a wrong in the name of justice, but to recognize the proper functions of the court and the jury, and after exercising due caution to prevent injustice, places the determination of disputed questions of fact in the tribunal provided by our Constitution and laws' (*Carr* v. *American Locomotive Co.,* 31 R. I. 234, 242 [77 Atl. 104, Ann. Cas. 1912B, 131])."

The contention that on the first appeal of the Crum and Albaugh cases substantially identical verdicts were held excessive, and that this had become the law of at least those two cases, is without merit. Although there is some language so indicating in the appellate court opinion, a careful reading of that opinion indicates that such language was predicated upon the assumption that as to quantity of water respondents had not been injured, for the reason that it was assumed the dam would always maintain the level of the

pool. In the last opinion rendered in these cases (3 Cal. (2d) 704, 720) this matter was discussed at length, and it was unequivocally held that on none of the prior appeals had the merits of the dam been passed upon. This is a new factor, for the first time fully considered in this opinion. The point now being urged is, therefore, without merit.

For the foregoing reasons it must be held that the verdicts are supported by the evidence and that they are not excessive as a matter of law, and that the record does not show that they were rendered under the influence of passion or prejudice. We repeat that the credibility of witnesses and the weight to be given to the evidence are questions primarily for the trial court and not for this court on appeal.

The other contentions of appellant are either repetitions in different form of points already discussed, or are so unsubstantial as not to require extended comment. In the Crum and Albaugh cases an attack is made on the arguments of respondents' counsel made to the jury. The questioned arguments had to do with an attack made on the credibility of appellant's experts, with certain disparaging remarks concerning expert testimony generally, and with certain comments on the facts which appellant contends were not justified by the record. Several of the remarks were undoubtedly improper, but in view of the entire record, and in view of the careful instructions given by the trial court, both when the remarks were challenged, and at the time of instructing the jury, that they were the sole judges of the facts and credibility of the witnesses, and that they should decide the case on the evidence and not on the arguments, it cannot be held that the arguments constituted prejudicial or reversible error.

As to the varied arguments predicated on the giving or refusing of certain instructions, or upon the hypothetical question, most of the major objections have already been passed upon. The other arguments are so unsubstantial as not to require comment.

For the foregoing reasons the judgments appealed from are and each is hereby affirmed.

Shenk, J., Waste, C. J., Nourse, J., *pro tem.*, Seawell, J., Edmonds, J., and Sturtevant, J., *pro tem.*, concurred.

Rehearing denied.