Filed 7/22/13  Wuerfel v. Quinn CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| NANCY KAY WUERFEL,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>DAMIEN JOSEPH QUINN,<br><br>    Defendant and Respondent. | A136077<br><br>(San Francisco County<br>Super. Ct. Nos. CCH-12-573391 &<br>CCH-12-573393 |
| MARY GALVIN,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NANCY WUERFEL,<br><br>    Defendant and Appellant. | |

Nancy Wuerfel filed a request for a civil harassment restraining order seeking protection against her next door neighbor, Damian Quinn.  Quinn's wife, Mary Galvin, filed a similar request against Wuerfel, seeking protection on behalf of Galvin herself, her husband, and their three children.  The requests came on for hearing before an experienced judge who heard from all three participants and from witnesses on their behalf.  Following that hearing, the judge denied Wuerfel's request for a restraining order

1

against Quinn, and granted a restraining order against Wuerfel in favor of Galvin and her family. Wuerfel appeals both orders. We affirm both orders.

## BACKGROUND

### The Requests

On May 3, 2012, acting in propria persona, Wuerfel filed a request for civil harassment restraining order, seeking protection against Quinn, her "next door neighbor" (request) on 23rd Avenue, in the Sunset district of San Francisco. Wuerfel's request described the last act of harassment as occurring on April 20, 2012, as follows: "Quinn was driving West on Ulloa Street and I was walking East on the southside of the street. When he noticed me on the sidewalk near 21st Avenue, he leaned towards me while staring at me out his driver's side window. About a minute later, after making a U-turn, he drove East on Ulloa and slowed down to yell at me through the open passenger side window 'Gonna getcha, gonna getcha.' Then he sped up and made a right turn onto 20th Avenue." Wuerfel checked the box that she was "harmed or injured" because of the incident, describing that "This clear threat was leveled at me the day after Quinn stalked me for ten minutes outside my home and ripped wood shingles off my house. This incident was the third intimidation attack on me 29 [*sic*] hours. He has uncontrolled rage against me. I am terrified of what he will do next." Wuerfel also checked that the police came and gave her an emergency protective order. The request was signed under penalty of perjury

Wuerfel's request had various attachments, including the referenced emergency protective order. Another attachment, described as "Attachment 7B—Previous Harassment," was a two-page memorandum from Wuerfel to Lieutenant Rich Quesada, described as Quinn's "recent vandalism, harassment, stalking of me." The two pages went on to describe what Wuerfel asserted was "Evidence of Ongoing Recent Harassment," with descriptions of incidents claimed to have occurred on April 15, 23, 25, 29, and 30. Also attached was an index of DVD images and a two-page letter from Wuerfel to Captain Curtis Lum, Commanding Officer, Taraval Police Station, with

enclosures that Wuerfel described as "photographs of written threats and vandalism" and "emails to Captain Paul Chignell and Supervisor Carmen Chu."

On May 3, Wuerfel was granted a temporary restraining order against Quinn, issued by the Honorable Donald Sullivan, who that same day set Wuerfel's request for hearing on May 23.

On May 3, another request for civil harassment restraining order was filed, this by Galvin. It sought protection against Wuerfel, not only for Galvin herself, but for four others: her husband Quinn and their three minor children, aged 15, age 12, and 8. Galvin's request described how Wuerfel "our next-door neighbor has engaged in a relentless campaign of harassment against our family . . . ." Handwritten attachment 3b, entitled "Why Others Need Protection," then went on to describe Wuerfel "entering our home without permission and taking photographs, reported to police case # 120 347 912." Galvin's hand-written statement then continued on in detail, as follows: Wuerfel "stalked my children, reported to police, case number not available at this time. [Wuerfel] [¶] (3) has appealed each and every permit we have applied for to maintain our home, our business and an investment property 4.6 miles away from our neighborhood. This has led to my financial loss, emotional strain, and my children sleeping in bedrooms with a leaking roof, while we waited for an appeal to be heard—3 mo. This appeal was fruitless, and was designated to cause us harassment as, obviously no city agency is going to prevent a home owner putting a roof on their home. [¶] (4) She has reported our home vacant and abandoned while we were living there, again requiring us to prove to city agencies this was not true or incur a heavy fine. [¶] (5) She has reported our childrens [*sic*] pets abandoned to the SPCA. Our dogs have been picked up causing our children untold distress when they have returned from school. This has happened 2/3 times each time the SPCA have returned our pets immediately. [¶] (6) She has contacted our mortgage lender, again saying our house was abandoned, again causing us great distress. [¶] (7) As bad as the above harassment is, witnessing my children's emotional distress and fear is painful. Wuerfel intimidates my children as they enter an [*sic*] leave the house. She does not speak, but will stand and stare at them. She will stand in our

3

driveway and stare up at the house. My 8 yr old will not walk out the front door of his home on his own. My 12 year old daughter will not sleep in her bedroom on her own. Our children's friends are also subjected to this intimidation, including the use of binoculars to stare into cars outside our home, while children are sitting in them."

In item number 6 on the request, "Other Court Cases," Galvin checked that Wuerfel had been involved with 'multiple SF City Agencies, Board of Appeals, Board of Supervisors, BIC." Galvin described the harassment as "on-going," as described further in Attachment 7a(3) (apparently identical in content to attachment 3b). Galvin's request was signed under penalty of perjury, by both her and her husband.

Judge Sullivan issued a temporary restraining order against Wuerfel, and also set Galvin's request for hearing on May 23.

Wuerfel filed her response to Galvin's request on May 10, signed under penalty of perjury. Attached to it was a three-page, single-spaced document entitled "Form CH-20 . . . Justification or Excuse," disputing all Galvin's claims. That attachment also had six exhibits, including copies of: a photograph, two Department of Building Inspection forms, a quit claim deed, a grant deed, and a listing for the sale of Galvin's property.

Quinn filed his response to Wuerfel's request on May 21, signed under penalty of perjury. Attached to it, as "Form CH-120 'Attachment 9—Justification or Excuse,' " was a six-page typed statement that read as follows:

"Response to request for Civil Harassment Restraining Orders by defendant Damien Quinn.

"The plaintiff Nancy Wuerfel has in effect filed this TRO and previous EPO as a continuation of the harassment which she has subjected me and my family to for many years. Now that she has exhausted every appeal process concerning my home at [on] 23rd Ave, my business at. . . Taraval Street (Four blocks from Wuerfel's home) and . . . Jersey Street (4.5 miles from Wuerfel's home), she has turned her attention to the police department and this court. I deny all allegations documented in her brief and have not been charged with any offense. In fact following several conversations with the local police department regarding her behavior, such as stalking our children (police report

4

100837206 included in report) and trespassing and taking photos without our permission (police report 120347912 included in report), we were advised to file a TRO against Wuerfel. I would like to outlay the bigger picture behind the motives of Wuerfel to seek this order.

"I am Wuerfel's next door neighbor; we purchased our home in 2002. Since occupying the property we have been subjected to a relentless campaign of intense hatred and intimidation leveled at us by Wuerfel. Wuerfel's ongoing campaign consists of a number of different acts, some of which trigger analysis under code of civil procedure 425.16 and some that do not. I include all to show Wuerfel's continuing obsession with my family and our home. Wuerfel to date has filed 24 complaints on our home at 23rd Ave. The complaints include various housekeeping issues (see attachment 3). In response to these complaints we have filed 7 building permit applications. Wuerfel has appealed each and every one to a litany of boards in San Francisco. Although this may appear privileged on the surface, she has registered the same appeal numerous times, sometimes to the same board, or the same appeal to a different board having not prevailed elsewhere. These complaints constitute malicious administrative prosecution and are designed solely to inflict emotional and physical stress on myself and my family.

"We had to move out of our home because of mold contamination. Not satisfied to see a family moved out Wuerfel immediately reported our property abandoned and vacant. Not happy with just reporting to the city she contacted our lender directly by mail enclosing copies of her complaints and photographs. Our lender instructed us to make repairs which Wuerfel then objected to and appealed and so the cycle began again. Wuerfel's only motive for contacting our lender was to ratchet up already extreme emotional and financial pressure and see us lose our home. Wuerfel knew we were renting nearby and were desperately attempting to repair our home because she was in fact sabotaging our efforts for years. Wuerfel IS NOT APARTY TO OUR MORTGAGE AND HAS NO PECUNIARY INTEREST IN OUR RELATIONSHIP WITH OUR LENDER. In effect she was using our lender as a tool to inflict stress to satisfy some

5

kind of warped desire to see our lender take action against us that would ostensibly force an NOD.

"It should be noted that while we were out of our home Wuerfel began stalking our children at our rental property. What civilized human being would take pleasure in scaring young children? Despite 2 years in a rental home under immense financial pressure paying rent and mortgage we were forced to move back to our home without any repairs being done. When we did move back we applied for a simple roofing permit and a mold remediation permit which Wuerfel immediately appealed. These appeals were purely malicious as it was obvious we would prevail after the 3 month waiting period. Wuerfel's campaign is solely designed to satisfy her desire to control and harm us. She routinely watches the house and we have had witnesses report her looking through windows with binoculars, watch our children on a daily basis, and photograph the car registrations of the workers working on the house. Our children become frightened when they are outside the house and they look around and see Wuerfel staring at them. We have two young children growing up in a safe neighborhood and they shouldn't have to be exposed to this hostility on a daily basis. We love our home and love our neighborhood. My children go to school in this neighborhood, play in this neighborhood, attend church in this neighborhood, and our lives are in this neighborhood. The only reason we want to leave it is because of Wuerfel. Her constant obsession with first our home and then our family are overwhelming and affect every aspect of our lives.

"Wuerfel has trespassed on my property and when questioned about this by the police department she justified it by saying she was asked to 'keep an eye on the house' and on further occasions she brought building inspectors onto our property without our permission. In 2011 she took photos inside our basement and described them vividly at a commission hearing. Wuerfel states that she took these photos outside, through a window that happens to be 12 inches from the ground. Our basement does not have adequate lighting and it is impossible to have the view shown on the pictures taken from the outside. She has photographed the inside of my property and taken measurements of my son's room, and then used these measurements to contest the legality of the bedroom

6

at the Board of Appeals. (A bedroom that was added to the house long before we purchased the home). She has actually admitted building inspectors to my property as if it was in fact hers.

"In every one of her appeals she has been publicly rebuffed and described by one commissioner as 'overzealous' and by another board member as a 'moving target' with regards to our property as she appears to have a different reason for appeal each time. On top of this she has reported my children's pets as abandoned to the SPCA. This only adds to their intimidation and fear of Wuerfel. Each time our pets have been returned to us immediately and we were informed that our next door neighbor had initiated the pick-up of our animals. What kind of human being takes any sort of satisfaction in terrorizing kids? Is her campaign so vicious that she involves my children and their pets?

"At this point a reasonable person may ask 'Why haven't we moved?' In January 2011 we purchased a property in Noe Valley 4.5 miles from Wuerfel. Considering Wuerfel's recent allegations one would assume she would have been delighted that we were moving. However, as soon as she learned of our interest in this property she transferred her campaign of harassment to . . . Jersey Street. She has filed 4 complaints which ultimately stalled the project for 7 months. At this point it became obvious to me and my family that the issue wasn't about the house at 23rd Ave, it was with us. A potential home was contaminated by her harassment once again. What relief from this harassment can we hope for if she can just follow us to any location? When we attempted to sell the property Wuerfel's campaign scared the buyers. Our buyers had contacted both the planning and building department as part of their due diligence only to be told that with Wuerfel involved and the department's previous experience at 23rd Ave 'it could take years to resolve.' We lost the sale.

"We should keep in mind Wuerfel's argument is that she is terrified of me and avoids me at all costs. At one of the appeals for . . . Jersey St. the commissioner commented that he was interested in the fact that she was the sole petitioner of the appeal and <u>lived 4.5 miles</u> from the subject property.

7

"In 2007 we secured a property at . . . Taraval Street cross street 21st Ave (4 blocks from Wuerfel) to date we have spent over 1 million dollars and had hoped to employ 22 people in a new family restaurant. Wuerfel has appealed each and every permit and license application even to the point that even after we secured the support of the Taraval Merchants Association, she formed her own Lower Taraval Merchants Association. She is not a merchant. In fact it is at this address that Wuerfel claims I followed her, apparently I cannot stand outside my own business. Again this is a person who would have you believe she is terrified of me and avoids contact with me.

"Her complaints are repetitive, frivolous, and malicious and are designed to inflict emotional pain and financial tort. There exists a law in CA which guarantees one, free peaceful and quiet enjoyment of their home and property. Wuerfel has wreaked havoc on our property, our financial security, and our emotional well-being. I am including in my exhibits an appraisal date in 2007 which shows our home valued at 1,150,000 and a multiple listing from 2011 as a short sale for 4.99,000 [*sic*] because of deterioration.

"I do feel angry, frustrated, and disgusted with Wuerfel. Since Wuerfel has exhausted every appeal under the sun does she now turn to this court as a new avenue for her contempt and harassment? Even with the mutual TROS in place the respect she shows this court is as follows. She was ordered to remain 3.5 yards away from my property while she is at home or 50 yards otherwise. The day she was served with the TRO from my family, and while her own EPO against me was still in effect she stood on my driveway looking into my garage while painters were working. The following day she stood having a 45 minute conversation within 10 yards of me. I notified the police and was told it was a matter for this court. She also filed another spurious complaint about my home that evening. Are these really the actions of a terrified woman?

"I lay this out to you to not only show Wuerfel's frame of mind but also my own. In this situation what would a reasonable person feel? I am also including a letter from our realtor showing we are actively seeking to purchase a home elsewhere. This is really disheartening considering that this is where my children have spent their childhood. I

8

plead with this court that if we are successful in finding a new home that Wuerfel will not be allowed to continue to inflict any further harm and suffering to my family.

"Finally, with regards to Wuerfel's allegations I have never threatened her, vandalized her house or property, and pose absolulutely [*sic*] no threat to her person. Wuerfel has opined in her brief that some of her reasons for eminent danger stem from my past association with Jimmy Jen (a former city employee) and a DUI issued in 2007. Both of these statements are true, but they have no bearing on this proceeding other than to tarnish my reputation. The plaintiff has in effect filed this TRO as a continuation of this relentless campaign of hatred and harassment which would allow her to continue to terrorize our business and follow us to a new abode, rented or otherwise. I implore the court to see this TRO not as a stand-alone but in the overall context, and deny the plaintiff.

"Some years ago, in an attempt to reach out to Wuerfel I requested mediation through Supervisor Chiu's office, Wuerfel declined. Please see attached correspondence."

Quinn's response also included 11 exhibits, including two police incident reports, and correspondence sent by Wuerfel to the Galvin-Quinn's lenders.

All the above was in the court file when the matter came on for hearing on May 23, 2012 before the Honorable Kay Tsenin. Before turning to a discussion of what occurred at the hearing, we digress briefly to set out the governing law, all set forth in Code of Civil Procedure 527.6 (section 527.6).

**The Applicable Law**

Section 527.6 begins as follows:

"(a)(1) A person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an injunction prohibiting harassment as provided in this section. [¶] . . . [¶]

"(b) For the purposes of this section:

"(1) 'Course of conduct' is a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose . . . .

9

"(2) 'Credible threat of violence' is a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose.

"(3) 'Harassment' is unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner.
[¶] . . . [¶] "(7) Unlawful violence' is any assault or battery, or stalking as prohibited in Section 646.9 of the Penal Code, but shall not include lawful acts of self-defense or defense of others."

These, then, were the statutory provisions to be applied by Judge Tsenin in making her ruling, which ruling may be based on affidavits or declarations, as well as oral testimony. (*Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 728; *Schraer v. Berkeley Property Owners' Assn.* (1989) 207 Cal.App.3d 719, 733, fn. 6; see generally 6 Witkin, Cal. Procedure (5th ed. 2008) Provisional Remedies, § 322, p. 262.)

**The Hearing**

The hearing began with identification of the parties and their possible witnesses, Meredith Monteith and Linda Yacobucci on behalf of Wuerfel, and Patrick Spiers and Ken O'Sullivan on behalf of Galvin and Quinn. Galvin said she had declarations from "witnesses who couldn't be here," to which Judge Tsenin responded, "Let's see where we go with this."

The substance of the hearing then began with Wuerfel's testimony, as follows:

"THE COURT: All right. Starting with Ms. Wuerfel, if you would tell me in a few words what's going on here.

"MS. WUERFEL: Your Honor, I am requesting a permanent restraining order against my next door neighbor Damien Quinn. There has been an escalation of harassment of me over the last three years. The first time that I reported incidents to the police were in June 2009 where Mr. Quinn wrote a message on some 8 by—plywood—

10

on plywood that was surrounding his house, and he spray painted the following message, 'If you are the big tree, I am a small axe. I am sharp, and I will cut you down.' There were other messages that he put on those plywood boards around that time, but that was the most intimidating.

"Then a year later I wrote a letter to Captain Lum at the Potrero Police Station; the first message I wrote to Captain Chignell. And I also then recorded, for the record, that Damien Quinn threatened me with, 'You are a horrible, horrible bastard. Your time is coming soon.'

"Then most recently on the 30th of April, Mr. Quinn threatened me while I was walking on Ulloa, and he drove by his car, made a U-turn to make sure that he could come back and yell at me out his window, 'Gonna getcha, gonna getcha.' With this, I was then prompted to add a request to the Taraval Police Station for an emergency protective order which was granted to me. And that was also in relationship to the other five police reports that I had made over vandalism to my property and to having shingles ripped off my house by Damien Quinn and as a result of several years worth of other physical attacks on my house.

"There's a lot of history here. There's a lot of years. But this is escalating to the point that I am in fear of my personal safety as well as that of my house.

"THE COURT: All right. Mr. Quinn, your turn.

"MR. QUINN: Your Honor, to believe Ms. Wuerfel's story of me and that she's in fear for her safety, let's look at what she does. When the emergency protective order was issued, the day it expired, prior to it expiring, she comes and she stands in my driveway staring into our house. This is a woman, again, who is terrified of us.

"We moved out of the house because of Ms. Wuerfel back in 2008. And, again, she leads you to believe that she's terrified of me, but what does she do? She comes to our rental property and stalks my children, where we have to get the police involved and have her stopped. We then had to—"

11

At that point, Judge Tsenin interrupted, as she would do in the course of the hearing, to ask Wuefel, the charged party, "Did you do that?" Wuerfel denied it, and Quinn's testimony resumed:

"MR. QUINN: We have a police report. And we also—I mean, what do we need to do? Bring in our children as testimony? They're damaged enough by this lady.

"THE COURT: Okay. Go ahead.

"MR. QUINN: Afterwards, we have—I mean, we're paying $5,500 a month mortgage and 4,000 in rent. We're forced to move back into the house without any repairs because of Ms. Wuerfel's repetitive, frivolous appeals to the Building Department.

"She escalates her—escalates her constant complaining to the Building Department, Board of Supervisors, et cetera, et cetera, so that we eventually in 2011, January 2011, we buy another house [on] Jersey Street, which is four and a half miles from Wuerfel's house. Again, she's so terrified of me, the next thing she does is she arrives at that house, enters the house, takes photographs inside the house, takes measurements inside the house, which she then uses to—

"THE COURT: Your house on Jersey Street?

"MS. GALVIN: Yes.

"MR. QUINN: Correct, four and a half miles away.

"THE COURT: Did you do that?"

Wuerfel again denied this charge, and this ensued:

"THE COURT: How do you know she took photographs?

"MR. QUINN: We were standing outside when she came. . . . She come—we're trying to get away from this lady. She's so terrified of me she follows me all over. She begins the exact same campaign of harassment on Jersey Street that she had done on 23rd Avenue. So, so far to date she's filed 31 complaints on our properties. Again, I—we're building a—

"THE COURT: Is that true? You filed 31 complaints?

"MS. WUERFEL: That is not true.

"THE COURT: How many complaints have you filed?

"MS. WUERFEL: Probably about seven or eight, because the house next door to me was vacant, and he would leave the windows open. I have documentation of leaving windows open, eventually to the point that one of the windows blew off and crashed into my house. And the people in the Building Department would not come out and make Mr. Quinn board up his house. He even allowed people to come in over the summer of 2010. Seven people lived there for three months and trashed the house every day at 3:00 a.m.

"THE COURT: It wasn't your house, was it?

"MS. WUERFEL: No, it was right next door. So the house next door is vacant for, basically, two years, and he then proceeded to have a variety of ways to destroy the house. And—

"THE COURT: Why would he want to destroy his own property?

"MS. WUERFEL: I would let him answer that. But it was clear. I have photographs so that you can see what—

"THE COURT: You have photographs of his Jersey house?

"MS. WUERFEL: No, I have photographs of the house next door, which is why I am asking for a restraining order. I don't know what he's talking about on Jersey Street."

Judge Tsenin then turned her attention to the "building complaints," that is, Wuerfel's complaints to the various city agencies, which, as Galvin confirmed, were described in Quinn's response. The following then ensued:

"THE COURT: Let's count them.

"MS. GALVIN: There's a lot.

" MR. QUINN: Your Honor, one thing. I mean, under section—code section 425.16, Ms. Wuerfel is, to some extent, privileged to file complaints. But, again, you would expect the woman that called, that she has—or a rational, sane person has some possibility of prevailing. Ms. Wuerfel would file a notice of violation. We would file a permit. She would appeal the permit. We would then go to whatever agency we're sent; the Board of Permit Appeals, we will prevail. We've never lost. We will prevail. She would then appeal that to the Planning Department, Building Inspection Commission,

13

and then possibly go back to the Board of Permit Appeals again to the point that we haven't been able to put a roof on our house. . . .

"THE COURT: 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24. A lot more than 7.

"MS. WUERFEL: Except I didn't call in all of those complaints. Two of them were made by the Building Department themselves by a default because of—

"THE COURT: Oh.

"MS. WUERFEL: —the vacant building.

"THE COURT: 8, 9, 10, 11, 12—what number was I at before?

"MR. QUINN: Your Honor, we should look at all of the addresses. . . . . Taraval Street is a restaurant we've been trying to build since 2007. Wuerfel has opposed every single permit.

"And if I could, I'd like to ask Patrick Spiers to read a letter which he witnessed Wuerfel distributing on Taraval Street, which, I mean, if it's not hate mail, I don't know what is.

"THE COURT: Okay. Let's hear from Ms. Wuerfel's witnesses.

"MS. WUERFEL: The witness that I have is particular to the threat.

"On February 23rd, Officer De Jesus came and responded to my call because I was being stalked. And he talked to me, and he also talked to Mr. Quinn. And he instructed both of us to stay away from each other and to not have any contact.

"The reason that I have a witness here is to testify to the fact that on April the 15th, Mr. Quinn not only once again ran his car into my driveway and destroyed plants in intimidation activities, he then walked up to my house and banged on the door. I was on the telephone with my friend here who heard this, and I wanted to make sure that it wasn't just my word against Mr. Quinn.

"Also, you'll see that there are other activities, through the videos, that create interaction that were to be prevented. I have a video with me, if you want to see it. I have stills of the video. I have documentation of years worth of destroying my property. And I'm prepared to provide the Court with whatever information that you want.

"THE COURT: Well, what does the video show?

14

"MS. WUERFEL: The video will show—the first video shows Mr. Quinn in broad daylight stomping down a small fence that I have in front just to keep people from walking onto the garden. He does it with his feet, and it's rather violent to see him kick down the fence. Then I have a video that's about a week later where at 1:34 in the morning he drives his car up over my curb and my plants, then parks his—

"THE COURT: Stop right there. Did you do those things, Mr. Quinn?

"MR. QUINN: Your Honor, if you look at what she calls her garden, it's actually street parking where—I have three children which have to exit roadside because she's erected fences—

"THE COURT: Did you stomp on her little fence?

"MR. QUINN: I stomped on the fence, yes.

"THE COURT: Okay. Now, is the fence on her property?

"MR. QUINN: No, it is not.

"MS. GALVIN: No, it is not. It's on the street.

"THE REPORTER: Wait, wait.

"THE COURT: One at a time. I know this is very hard.

"MR. QUINN: Sorry. We've had DPW out numerous times to have her remove one of the plants because it's toxic to the children. She grows these cactuses that will cut you to the bone, which are not recognized city plants. Secondly, she erects a fence so that you can't exit curbside on the city street, not on her property. So yes, I did remove the fence so that my children coming home from school could exit curbside.

"THE COURT: All right. I have another question, Ms. Wuerfel. There are two complaints here—at least two that I have found so far—a reporting animals abandoned. Did you file these complaints?

"MS. WUERFEL: No, I did not. And I checked with Animal Care and Control, and they indicate that there was a man that reported the abandonment of the animals that were barking all night long. I did not make those complaints.

"MR. QUINN: Your Honor, when the SPCA came out, I was at the house, and they told me straight out that it was my next door that had—there's actually four reports

15

to—the last being the night of my son's graduation party. Wuerfel watched us leave the house, go to the—go to the party. When we returned, the animals had been taken from our rear yard. She had reported to the SPCA that the house was vacant and abandoned.

"THE COURT: All right. What do your witnesses have to say?

"MS. MONTEITH: One Sunday night last month Ms. Wuerfel and I were having a telephone conversation. And in the background, I heard loud, very loud banging on her front door. And it wasn't a simple knocking. It was very forceful. Ms. Wuerfel said, 'Wait a minute.' And there was a pause, and she came back to the phone and said, 'It's him.' And I was very concerned for her safety because it was a very aggressive act, and Mr. Quinn had been ordered to stay away from her. And I asked her if she was in any danger. She said, 'No, he's—he's leaving."

"THE COURT: Okay. Mr. Quinn, did you go bang on her front door?

"MR. QUINN: No, your Honor. It never happened.

"THE COURT: Did you ever go to her front door?

"MR. QUINN: No, your Honor. I have never had any interaction with her whatsoever.

"THE COURT: Did you paint the stuff on the plywood?

"MR. QUINN: Your Honor, the one with the big tree, small axe is actually Marcus Garvey, one of the greatest freedom fighters ever. And the rest, I think, comes out of the Bible. If Ms. Wuerfel is vain enough to think that it was a threat against her, she should go back to school.

"THE COURT: Please don't. I mean, obviously, you did it because of her. I mean, I'm not—

"MS. GALVIN: But it was an act of frustration.

"THE COURT: That I understand; I understand that.

"MS. GALVIN: It wasn't a personal threat.

"MR. QUINN: And, your Honor, you got to remember. The only reason why the plywood was up, because Wuerfel had made us put up the plywood.

"MS. GALVIN: After contacting our bank, our lender.

16

"THE COURT: I'm not—I can understand where the frustration is.

"All right, Ms. Wuerfel, how about your other witness?

"MS. YACOBUCCI: I attended all the hearings of the appeals boards with Nancy [Wuerfel]. All of her appeals were based on legal building and planning code violations.

"THE COURT: Has she won any of the appeals?

"MS. YACOBUCCI: I don't believe—have you? No.

"THE COURT: Seems like a lot of harassment to me.

"MS. WUERFEL: Can I comment on that, your Honor?

"THE COURT: Yes.

"MS. WUERFEL: There was a withdrawal of one permit and a cancellation of another permit. And two other permits were then awarded. So it's a 50/50 result of my going to the Board of Appeals.

"MR. QUINN: Your Honor, can I just interject for one second?

"THE COURT: Go ahead.

"MR. QUINN: And, again, under 425.16 she has the right to appeal. But, again, one of the things she used the overall appeals for was to run down the condition of our house at which point then she notified our lender, who then ordered us to make repairs within 90 days. We applied for permits to make the repairs instigated by our lender, which she then appealed. The lender then filed a Notice of Default. She has no pecuniary interest in our mortgage or our lender, period."

At the conclusion of the hearing Judge Tsenin ruled against Wuerfel, granting Galvin and her family protection against Wuerfel, and denying Wuerfel's request.

A formal order in favor of Galvin (and her family) was entered on May 23, ordering Wuerfel to stay 150 yards away "except 10 feet away while in or about . . . 23rd Avenue." No formal order is in the record denying Wuerfel's request.

On July 20 Wuerfel, represented by counsel, appealed from the "Civil Harassment Restraining Order . . . entered on or about May 23, 2012."

## DISCUSSION

Wuerfel, represented by the same counsel on appeal, makes two arguments attacking Judge Tsenin's orders, that she erred in (1) denying Wuerfel's request for a civil harassment restraining order and (2) granting Galvin's request. We conclude that neither argument has merit. Before turning to a discussion of why, we set forth some observations about the principles governing here, beginning with comments about Wuerfel's briefs, which completely ignore the rules of appellate procedure.

The way Wuerfel sets out the facts in her brief is to tell the story based on her version of the facts. Reading Wuerfel's recitation of facts, not to mention the arguments premised on those facts, a reader would not even know that there was another side to the story—let alone the side believed by Judge Tsenin. This is most improper.

California Rules of Court, rule 8.204(a)(2)(C) provides that an appellant's opening brief shall "[p]rovide a summary of the significant facts. . . ." The leading California appellate practice guide instructs about this: "Before addressing the legal issues, your brief should accurately and fairly state the critical facts (including the evidence), free of bias; and likewise as to the applicable law. [Citation.] [¶] Misstatements, misrepresentations and/or material omissions of the relevant facts or law can instantly 'undo' an otherwise effective brief, waiving issues and arguments; it will certainly cast doubt on your credibility, may draw sanctions [citation], and may well cause you to lose the case!" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2012) ¶ 9:27, p. 9-8, italics omitted.) Wuerfel's brief ignores such instruction. And more.

" 'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' [Citations.] Defendants' contention herein 'requires defendants to demonstrate that there is *no* substantial evidence to support the challenged findings.' [Citations.] A recitation of only defendants' evidence is not the 'demonstration' contemplated under the above rule. [Citation.] Accordingly, if, as defendants here contend, 'some particular issue of fact is not sustained, they are required to set forth in their brief all the material evidence on the

18

point and *not merely their own evidence*.  Unless this is done the error is deemed to be waived.' [Citations.]"  (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; accord, *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887.)

What Wuerfel attempts here is merely to reargue the "facts" as she would have them, an argumentative presentation that not only violates the rules noted above, but also disregards the admonition that she is not to "merely reassert [her] position at . . . trial." (*Conderback, Inc. v. Standard Oil Co.* (1966) 239 Cal.App.2d 664, 687; accord, *Albaugh v. Mt. Shasta Power Corp.* (1937) 9 Cal.2d 751, 773.)  In sum, Wuerfel brief manifests a treatment of the record that disregards the most fundamental rules of appellate review.  (See 9 Witkin, Cal. Procedure*, supra,* Appeal § 365, pp. 421-423, and § 368, pp. 425-426.)  As Justice Mosk well put it, such "factual presentation is but an attempt to reargue on appeal those factual issues decided adversely to it at the trial level, contrary to established precepts of appellate review.  As such, it is doomed to fail." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398-399.)  And fail it does, as there is substantial evidence supporting Judge Tsenin's ruling here.

**The Standard of Review**

"The appropriate test on appeal is whether the findings (express and implied) that support the trial court's entry of the restraining order are justified by substantial evidence in the record. (*Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131, 1137-1138 [injunctions under § 527.6 are reviewed to determine whether factual findings are supported by substantial evidence; trial court's determination of controverted facts will not be disturbed on appeal.)]"  (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188.)

The substantial evidence rule applies without regard to the standard of proof required at trial.  Put otherwise, the standard of review remains substantial evidence even if the standard below is "clear and convincing" evidence.  (See *Crail v. Blakely* (1973) 8 Cal.3d 744, 750; *In re Marriage of Ruelas* (2007) 154 Cal.App.4th 339, 345.)  As one Court of Appeal put it:  " 'Thus, on appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's

19

evidence, however slight, and disregarding the appellant's evidence, however strong." . . .' 'We have no power to judge the effect or value of the evidence, to weigh the evidence [or] to consider the credibility of witnesses' . . . ." (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.)

*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762 described the principle in a section 527.6 case: "In assessing whether substantial evidence supports the requisite elements . . ., as defined in Code of Civil Procedure section 527.6, we review the evidence before the trial court in accordance with the customary rules of appellate review. We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925; [citations]."

### Denial of Wuerfel's Request For a Civil Restraining Order Was Proper

Wuerfel's first argument is that Judge Tsenin erred in denying Wuerfel's request for a civil restraining order, an argument that asserts Judge Tsenin "improperly refused to receive or consider [Wuerfel's] evidence including photographs and videotape." In Wuerfel's words, she "proffered a variety of evidence of such harassment in the form of personal testimony, witness statements, photographs, and even video of many of the destructive and harassing incidents. (RT0008, Ln.16-21.) For unknown reasons, the Court did not review the offered evidence. The evidence satisfies the requirements of section 527.6; the Superior Court erred by denying the request for a Restraining Order."

As indicated above, the record contains no order denying Wuerfel's request, so it might be that there is nothing from which Wuerfel can appeal on this point. But passing over such procedural problem, Wuerfel's argument fails on the merits. The cited transcript passage—RT 8:16-21—reads in its entirety as follows:

"MS. WUERFEL: Also, you'll see that there are other activities, through the videos, that create interaction that were to be prevented. I have a video with me, if you want to see it. I have stills of the video. I have documentation of years worth of

20

destroying my property. And I am prepared to provide the Court with whatever information that you want."

We see nothing there, or any place else in the record, supporting the claim that Judge Tsenin "did not review the offered evidence." Perhaps she did not believe it. Perhaps she thought it did not measure up. But there is nothing supporting the claim that Judge Tsenin did not consider it.

To the contrary, Judge Tsenin asked, "Well, what does the video show," and the follow-up revealed that the contention has to do with the obstruction of curbside city property. Moreover, Wuerfel's application had attached to it a two-page narrative of her claims of prior harassment, an index with descriptions of what purports to be 22 photographs or videos of various claims, a two-page letter to a police captain with another set of various claims, and four pages of photographs of various claims. All of this, of course, was before Judge Tsenin.

The two cases cited by Wuerfel—*Adler v. Vaicius* (1994) 21 Cal.App.4th 1770 and *Schraer v. Berkeley Property Owners Assn., supra,* 207 Cal.App.3d 719—are not to the contrary. *Adler* does not even involve the issue, but rather a trial court's failure to have a hearing where the "business of the court prevented a hearing when set due to unavailability of a judge." (*Adler v. Vaicius, supra,* 21 Cal.App.4th at p. 1776.)

*Schraer* is equally inapplicable. As described by our colleagues in Division Three: "[c]ontrary to the express requirements of the statute, the trial court expressly refused to permit the introduction of oral testimony, and based its decision entirely on written declarations, newspaper articles, and the arguments of counsel. The trial court repeatedly stated that it was not required to make a factual determination of 'what has occurred in the past,' but was only supposed to 'keep the peace' by preventing possible *future* violations of the law. The court went on to base its conclusion that future harassment *might* occur by relying on concededly hearsay press accounts of what the appellants had said or were represented to have said; it then explicitly shifted to appellants the burden of proving that the statements were *not* made or were not authorized. In so doing, the trial court manifested a fundamental misunderstanding of its

21

role under the procedural statute in question." (*Schraer v. Berkeley Property Owners Assn., supra,* 207 Cal.App.3d at p. 731.)

Finally, even assuming that Wuerfel demonstrated that Judge Tsenin refused to consider evidence—which Wuerfel has not shown—Wuerfel's argument is defeated by *Malatka v. Helm* (2010) 188 Cal.App.4th 1074, 10876, where the Court of Appeal rejected a similar argument by a losing defendant in a section 527.6 case: "In order to obtain appellate review of a ruling excluding evidence, its proponent must have made known to the court '[t]he substance, purpose, and relevance of the excluded evidence . . . by the questions asked, an offer of proof, or by any other means.' (Evid. Code, § 354, subd. (a).) In this case, defendant neither objected at the hearing . . . to the court's exclusion of this evidence or offered to prove the contents of the declarations at that hearing. . . . We conclude that defendant, by failing to make a timely objection or offer of proof, has forfeited her claim that the trial court erred by failing to consider declarations attached to her opposition." (Fn. omitted.) Like the appellant in *Malatka*, Wuerfel made no offer of proof.

**The Restraining Order Against Wuerfel Was Proper**

Wuerfel's second argument is that Judge Tsenin erred in granting the civil harassment restraining order in favor of Galvin and her family. The argument has two subparts: (1) Judge Tsenin improperly considered Wuerfel's constitutionally protected actions; and (2) there is no substantial evidence to support the order.

As to the claim of "protected activity," we have several observations. First, the law is that "Speech that constitutes harassment within the meaning of C.C.P. 527.6 is not constitutionally protected, and the victim of the harassment may obtain injunctive relief. However, an injunction burdening protected speech will be upheld only to the extent that its provisions burden no more speech than required to serve a significant government interest." (6 Witkin, Cal. Procedure, *supra,* Provisional Remedies, § 318, p. 254, citing *Huntingdon Life Sciences v. Stop Huntingdon Animal Cruelty USA* (2005) 129 Cal.App.4th 1228, 1250, 1265.)

The record reflects that Wuerfel has filed numerous complaints, perhaps as many as 31, many of which are related to the residential property next door, causing Galvin and Quinn to file seven building permit applications. Wuerfel has appealed each of these applications to various boards and agencies. Indeed, Wuerfel has registered the same appeal numerous times, sometimes to the same board, or the same appeal to a different board having not prevailed elsewhere. At every one of her appeals, Wuerfel has been publicly rebuffed. As her own witness, Linda Yacobucci, admitted at the hearing— apparently having glanced over to Wuerfel—she has not won one appeal. She has been described by one commissioner as "overzealous" and by another board member as a "moving target," as she appears to have a different reason for appeal each time.

Second, as Galvin and Quinn point out, they are not contending that Wuerfel's constitutionally protected activities should be interfered with—indeed, the order does not even address them. As discussed at length above, the conduct about which Galvin complained—and which supported Judge Tsenin's ruling—included conduct well beyond Wuerfel's communications with public agencies. It included trespassing on their property, going to their property five miles away, and, perhaps as importantly as anything, intimidating their children. Beyond that, Wuerfel contacted Galvin and Quinn's commercial lender, which is not a regulatory agency.

Wuerfel's second subargument, that there is no substantial evidence, is fatuous, as shown by the submissions by Galvin and Quinn discussed at length above, and testified to at the hearing before Judge Tsenin.

Wuerfel has filed a request to augment the record, requesting we add page 13 of the reporter's transcript and copies of videos offered in evidence to the trial court. Galvin and Quinn have filed a request for judicial notice, requesting we take notice of what is claimed to be documentary evidence of posthearing conduct by Wuerfel. We deny both requests.

### DISPOSITION

The orders are affirmed.

_____
Richman, J.

We concur:


_____
Haerle, Acting P.J.


_____
Lambden, J.